In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 05-2366

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

IVAN EBERHART,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 946—**James B. Zagel**, *Judge.*

———————

ARGUED SEPTEMBER 6, 2006—DECIDED NOVEMBER 1, 2006

———————

Before FLAUM, *Chief Judge*, and BAUER, and POSNER, *Circuit Judges.*

FLAUM, *Chief Judge.* On April 3, 2002, a jury convicted Ivan Eberhart of conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846 and acquitted him of distributing cocaine in violation of 21 U.S.C. § 841(a)(1). Eberhart appeals his conviction, arguing that his trial was tainted by prosecutorial misconduct, improperly admitted evidence, and improper jury instructions. He also claims that the district court erroneously denied his motion for acquittal. For the following reasons, we affirm Eberhart's conviction and sentence.

## I.  Background

On December 16, 1998, DEA Agents Daniel Foley and Robert Glynn arrested Charles Bolden after he sold two kilograms of cocaine to a government informant. Once arrested, Bolden agreed to help apprehend his supply source, who he identified as "E" and who the agents later identified as Eberhart.

At the agents' direction, Bolden made several calls to Eberhart to arrange for the purchase of two additional kilograms of cocaine. While Bolden made the calls, Agent Foley listened to Bolden's half of the conversations, and the agents made tape-recordings of both sides of the conversations. During one of the calls, Bolden said he needed "two more," and Eberhart said "okay." They also agreed to meet the next day outside a Kentucky Fried Chicken near the intersection of 83rd Street and Martin Luther King Drive in Chicago.

Before the meeting, the agents instructed Bolden to discuss a previous cocaine transaction, to indicate a willingness to pay Eberhart for a previous cocaine-related debt, and to give them a signal once the conversation occurred so that they could arrest Eberhart. Agent Glynn placed a transmitting device and tape recorder underneath Bolden's clothing to allow the agents to listen to the conversation as it occurred and preserve the conversation for later use.

When Eberhart arrived at the previously agreed-upon location, he expressed (a well-founded) concern that Bolden was wearing a wire:

> EBERHART: I'm talking about what you was talking about when you was down there at the office down at DEA. Uh.
>
> . . . .
>
> BOLDEN: All mother fuckers shady, you think I'm wired or something.

EBERHART: I'm just wondering, I'm just wondering . . . . You'd be concerned too (Unintelligible) I'm just curious.

Govt. Transcript 8A. Once Bolden allayed Eberhart's fears that he was acting as a government informant, the men discussed a $40,000 debt that Bolden owed Eberhart. Eberhart expressed his general lack of concern about the debt, and the meeting ended. Bolden exited the car and signaled the agents, who arrested Eberhart. They discovered no drugs in Eberhart's possession.

The agents read Eberhart his *Miranda* rights, and he confessed that he had distributed between twenty and forty kilograms of cocaine per month, that Bolden was one of his customers, and that he had sold Bolden two kilograms of cocaine on December 15, 1998. Eberhart also agreed to help the agents arrest his supply source, identified only as "Tommy." Eberhart gave the agents a physical description of Tommy, his cellular and pager phone numbers, and the location of a "stash house" out of which Tommy operated. Eberhart explained that he received his drugs from Tommy on consignment and that he would pick up his cocaine at the stash house at 6:00 a.m. or 6:00 p.m.

At the agents' direction, Eberhart then called Tommy to arrange a purchase. Soon after Eberhart made that phone call, however, he ceased cooperating, and the agents never located Tommy. Nevertheless, they followed up on the information that Eberhart had provided, and a consensual search of the stash house uncovered two high-speed money counters, a firearm, and a scale.

At trial, the government introduced evidence of the investigation as described above. They played recordings of Eberhart and Bolden's conversations on the phone and in the car and provided the jury with transcripts of these conversations prepared by Agent Foley. The defense offered evidence that on December 15, 1998, the date that Eberhart

allegedly sold two kilograms of cocaine to Bolden, Eberhart was at home—from 2:00 p.m. until midnight— dealing with the aftermath of a residential burglary at his home. Several witnesses testified that Eberhart was at his residence during this time fixing a broken window, speaking with police, and installing burglar bars. This testimony was problematic for the prosecution, because Bolden claimed that Eberhart had sold him drugs on the afternoon of December 15, 1998.

At trial, Eberhart made evidentiary objections and requested a number of jury instructions. He made a general objection, which the court overruled, that the government transcripts of the tape recordings were inaccurate. He also objected to the agents' testimony concerning the recorded conversations between Bolden and Eberhart, claiming they were hearsay. The court overruled the objection, concluding that the government was offering the statements, not for the truth of the matter asserted, but to explain the course of their investigation.

Eberhart also requested a missing witness instruction, which would have allowed the jury to draw a negative inference based on the government's decision not to call Bolden. The government objected, arguing that Bolden had pleaded guilty without a plea agreement and that the witness was not particularly within its power to produce. The court refused to give the instruction. Eberhart also sought a *Sears* instruction, which would have informed the jury that it could not consider Bolden a co-conspirator based on actions he took after December 16, 1998, the day he began cooperating with the government. The court refused this request as well, stating, "I'm satisfied [if] the govern-ment makes it clear in its argument that it does not regard Bolden as a conspirator after the time of the arrest." R. 478. The prosecutor responded, "Yes, correct." *Id.* Defense counsel then stated, "If they make that plain to the jury, I think that goes a long way." *Id.* During closing argument,

the government did not tell the jury that it should not consider Bolden a conspirator after the time of his arrest.

On April 3, 2002, the jury convicted Eberhart of conspiring to distribute or possess more than five kilograms of cocaine but acquitted him of distributing cocaine. On May 15, 2002, Eberhart filed a motion for a new trial, arguing, among other things, that one of the transcripts of the tape recordings, Transcript 7A, wrongly indicated that Eberhart requested to meet Bolden "face to face." In a supplemental brief filed on October 30, 2002, Eberhart also argued that the district court erred by allowing Agent Foley to testify about his conversations with Bolden and by not instructing the jury that a buyer-seller relationship cannot form the basis of a conspiracy conviction.

In a post-trial hearing on his motion for a new trial, Eberhart offered evidence that Bolden was willing to cooperate with the government at the time of Eberhart's trial. Bolden's attorney, Jonathon Minkus, testified that Bolden's sentencing was delayed for over a year and a half "in part" because of his desire to earn a lower sentence in exchange for cooperation. Minkus claimed that the government was reluctant to use Bolden, however, because of repeated and irreconcilable conflicts in his proffers. Eberhart also offered expert testimony that he never requested to meet Bolden "face to face" as indicated in Transcript 7A.

On March 21, 2003, the district court denied Eberhart's motion for judgment of acquittal but granted his motion for a new trial. It reasoned that "the possibility that [Transcript 7A] is not supported by the tape, the absence of a buyer-seller instruction[,] and . . . the testimony that Bolden gave the name 'E' as his supplier all together persuade me that the interests of justice require a new trial." *United States v. Eberhart*, No. 98 CR 946, 2003 WL 1340047, at *3 (N.D. Ill. March 19, 2003). The court

stated that "none of these concerns standing alone or in pairing would cause me to grant a new trial[, but] the combination of all three causes me to grant the motion." *Id.*

On appeal, we reversed the district court's decision, concluding that the district court did not err by admitting Transcript 7A and that we had no jurisdiction to consider arguments that Eberhart had raised for the first time in an untimely filed supplemental memorandum. *United States v. Eberhart*, 388 F.3d 1043, 1049-50 (7th Cir. 2004) (*Eberhart I*). The Supreme Court reversed our decision, holding that Federal Rule of Criminal Procedure 33(a) is not a jurisdictional limitation. *Eberhart v. United States*, ___ U.S. ___, 126 S. Ct. 403, 407 (2005). On remand, we considered the arguments in Eberhart's supplemental memorandum but found, once again, that the district court erred by granting a new trial. *United States v. Eberhart*, 434 F.3d 935, 940 (7th Cir. 2006) (*Eberhart II*), *cert. denied*, No. 06-5233, ___ S. Ct. ___, 2006 WL 1981739 (Oct. 2, 2006).

The district court then sentenced Eberhart to 135 months in prison. At the sentencing hearing, the defense argued that the jury's conclusion that the conspiracy involved more than five kilograms of cocaine was contrary to the weight of the evidence and should be set aside. The district court rejected the argument.

## II.  Discussion

In this appeal, Eberhart makes three new arguments. He contends that the district court erred by refusing a missing witness instruction and a *Sears* instruction; the government did not properly authenticate its tape recordings before offering them into evidence; and the government did not offer sufficient evidence to support a conviction.

### A.  Missing Witness Instruction

Eberhart first argues that the government violated his due process rights by misrepresenting to the district court that Bolden was not cooperating with the government. Had the government been more forthright, Eberhart contends, he would have been entitled to a missing witness instruction, which would have allowed the jury to conclude that Bolden's testimony would have been unfavorable to the prosecution. *See Graves v. United States*, 150 U.S. 118, 120-21 (1893).

This argument fails for two reasons. First, Eberhart has not pointed out any misrepresentation made by the government. We noted as much in our first two rulings. *Eberhart II*, 434 F.3d at 939-40; *Eberhart I*, 388 F.3d at 1051. He maintains that the government dishonestly stated that Bolden was not cooperating, but in the portion of the trial transcript he cites, the government only asserts that Bolden received no benefit for his cooperation and that Bolden "turned the other way at some time." R. 471-72. The record demonstrates that both of these statements were true. Bolden never entered a cooperation agreement with the government, and for a period of time in 1999, he stopped cooperating altogether (though after he was convicted at trial, he began making proffers again).

Second, even if the government had advised the district court that Bolden was willing to testify for the government,

Eberhart would not have been entitled to a missing witness instruction. To obtain that instruction, a defendant must prove that "the absent witness was peculiarly within the government's power to produce" and that "the testimony would have elucidated issues in the case and would not merely have been cumulative." *See United States v. Brock*, 417 F.3d 692, 699 (7th Cir. 2005). Eberhart has not established, or even argued, that the government was in a better position than he was to produce Bolden at trial. Indeed, at oral argument Eberhart's attorney acknowledged that he could have called Bolden but chose not to do so. Under these circumstances, the district court did not err by refusing to give a missing witness instruction. *See United States v. Rollins*, 862 F.2d 1282, 1298 (7th Cir. 1988) (holding that the district court did not err in concluding that an incarcerated government informant was not particularly within the government's power to produce); *United States v. Torres*, 845 F.2d 1165, 1169-70 (2d Cir. 1988).

Eberhart also argues, citing *United States v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993), that by not disclosing Bolden's willingness to cooperate, the government violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963). In *Kojayan*, the government accused Kojayan of conspiracy to possess heroin with intent to distribute. An undercover police officer testified on behalf of the government and recited statements made by one of Kojayan's alleged co-conspirators named Nourian. Before trial, Kojayan had attempted to discover Nourian's whereabouts and whether he had agreed to cooperate with the government, but the government refused to provide Kojayan with this information. It did provide her with the name of Nourian's attorney, but the attorney only said that if called, Nourian would invoke his Fifth Amendment privilege against self-incrimination. During closing argument, Kojayan's attorneys asked the jury to infer that Nourian's testimony would have undercut the government's case. In response, the government falsely

claimed that it was not capable of calling Nourian. In truth, the government had a cooperation agreement with Nourian but decided against calling him. The court held that the government violated *Brady* by not disclosing the cooperation agreement, which might have convinced the district court to give the jury a missing witness instruction. *Kojayan*, 8 F.3d at 1322.

In this case, unlike *Kojayan*, the government did not make any misrepresentations to the jury or to the district court and did not refuse to disclose the existence of a cooperation agreement (indeed, none existed). In addition, as discussed above, even if the government had disclosed Bolden's willingness to cooperate, Eberhart would not have been entitled to a missing witness instruction because he could have called Bolden himself. For these reasons, *Kojayan* is distinguishable; no *Brady* violation occurred here.

## B. *Sears* **Instruction**

Eberhart next argues that the district court erred by refusing a *Sears* instruction, which states that an agreement with a government informant cannot constitute a criminal conspiracy. *See Sears v. United States*, 343 F.2d 139 (5th Cir. 1965). The court reviews a district court's refusal to give a theory of defense instruction *de novo*. *United States v. Buchmeier*, 255 F.3d 415, 426 (7th Cir. 2001).

> [A] defendant is entitled to a jury instruction as to his or her particular theory of defense provided: '(1) the instruction represents an accurate statement of the law; (2) the instruction reflects a theory that is supported by the evidence; (3) the instruction reflects a theory which is not already part of the charge; and (4) the failure to include the instruction would deny the appellant a fair trial.'

*Id.* (quoting *United States v. Swanquist*, 161 F.3d 1064, 1075 (7th Cir. 1998)).

The government argues that Eberhart was not entitled to a *Sears* instruction because it was inconsistent with his defense at trial. A jury instruction, however, does not have to completely track the defense presented; it need only represent "a theory that is supported by the evidence." *Buchmeier*, 255 F.3d at 426. Because the jury could have inferred a continuing conspiracy between Bolden and Eberhart based on the December 16 and 17, 1998 conversations, a *Sears* instruction was proper. *See Duff v. United States,* 76 F.3d 122, 127 (7th Cir. 1996) (holding that a *Sears* instruction was proper where the indictment was worded in a manner that allowed the jury to believe that the conspiracy with the confidential informant was enough to convict the defendant and the confidential informant's drug transactions with the defendant played a prominent role in the trial).

The error was harmless, however, because based on the special verdict, the jury must have concluded that Eberhart conspired to distribute cocaine before December 16, 1998. The transaction that Bolden and Eberhart contemplated on December 16 and 17 only involved two kilograms of cocaine, but the special verdict stated that Eberhart conspired to distribute five or more kilograms of cocaine. Consequently, the jury necessarily found that Eberhart conspired to distribute drugs sometime before December 16, and the district court's decision not to provide a *Sears* instruction was not prejudicial.

It is possible, of course, that the decision not to give a *Sears* instruction affected the jury's drug quantity determination. For instance, the jury may have concluded that Eberhart conspired to distribute three kilograms of cocaine before December 16 and two kilograms afterwards. That possible error has no bearing, however, on the validity

of the conspiracy conviction, which is the only concern we have here. Ultimately, the drug quantity determination was one for the district court to make at sentencing, and, as discussed below, it did not err in concluding that the conspiracy involved more than five kilograms of cocaine.

### C. Authentication of Tapes

Eberhart next argues that the district court erred by admitting Government Exhibits 6, 7, 8, and 10, a number of tape recorded conversations between Eberhart and Bolden and between Eberhart and Tommy. Eberhart contends that the government did not properly authenticate the tapes and that the tapes contain inadmissible hearsay. Eberhart concedes that he made no objection to Exhibits 7 and 10 and that, as a result, we should review their admission for plain error. He does maintain, however, that he properly objected to the improper authentication of Exhibits 6 and 8. The government disagrees.

At trial, Eberhart explained his objection to Exhibit 6, a tape recording of four December 16, 1998 phone calls between Bolden and Eberhart, as follows, "The objection to the tape is based on the fact that there was no adequate foundation in terms of showing that the tape-recording equipment had been tested and functioning properly." R. 63. With regard to Exhibit 8, a recording of Eberhart and Bolden's conversation outside Kentucky Fried Chicken, Eberhart made a general foundation objection. Neither of these objections sufficiently advised the district court and the government that Eberhart was contesting the authentication of the tapes. A "foundation" objection is "simply a loose term for preliminary questions designed to establish that evidence is admissible" and is not usually specific enough to preserve an alleged error on appeal. *See A.I. Credit Corp. v. Legion Ins. Co.,* 265 F.3d 630, 637-38 (7th Cir. 2001); *United States v. Barker*, 27 F.3d 1287, 1292 (7th

Cir. 1994). Moreover, an objection concerning whether the recording equipment was functioning properly would not have alerted the district court to Eberhart's current objection that the tapes were not true and accurate recordings of the December 16 and 17, 1998 conversations between Bolden and Eberhart. *See United States v. Westmoreland*, 312 F.3d 302, 311 (7th Cir. 2002). Consequently, we review the admission of Government Exhibits 6, 7, 8, and 10 for plain error, which requires Eberhart to demonstrate an error that was obvious, affected his substantial rights, and seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Montgomery*, 390 F.3d 1013, 1017 (7th Cir. 2004).

Before a tape recording may be properly admitted at trial, Federal Rule of Evidence 901(a) requires the government to offer "evidence sufficient to support a finding that the [tape] in question is what its proponent claims." We have said that this requires the government to show by clear and convincing evidence that the proffered tape is a true, accurate, and authentic recording of the conversation between the parties. *Westmoreland*, 312 F.3d at 311. It may do so by establishing the chain of custody or by offering testimony of an eyewitness that the recording accurately reflects the conversation he or she witnessed. *See United States v. Carrasco*, 887 F.2d 794, 802 (7th Cir. 1989). District courts are given wide latitude to determine whether the government has met its burden, as is generally the case with evidentiary rulings. *Id.*

The district court did not err by admitting Government Exhibits 6 and 7. Agent Foley testified that he listened to Bolden's half of the December 16 and 17 conversations as they occurred and that the recordings accurately portrayed what Bolden said during those conversations. He also testified that he recognized the second voice on the recordings as Eberhart's. Though Agent Foley did not listen to Eberhart's half of the conversations as they occurred, his

testimony sufficiently established the tapes' authenticity by clear and convincing evidence. Just as a court may admit a tape recording despite a gap in the chain of custody, *see United States v. Rivera*, 153 F.3d 809, 812 (7th Cir. 1998), a court may admit a recording where a witness testifies that he only heard half of the recorded conversation. What the witness did not hear goes to the evidentiary weight of the recording, not to its admissibility. *Id.*; *United States v. Brown*, 136 F.3d 1176, 1182 (7th Cir. 1998) ("Merely raising the possibility (however hypothetical) of tampering is not sufficient to render evidence inadmissible.").

The same reasoning requires us to conclude that the district court did not err by admitting Government Exhibit 10, which was a tape recording of a number of telephone conversations between Eberhart and a person the government claimed was his supplier. Agent Foley testified that he listened to Eberhart's half of the conversations as they occurred and that the recordings accurately portrayed what Eberhart said during those conversations. This testimony sufficiently supported the district court's admission of this exhibit.

The admission of Exhibit 8, however, is more problematic. The government offered scant evidence that the tape played at trial was the one that recorded Bolden and Eberhart's conversation outside the Kentucky Fried Chicken. Because of an equipment malfunction, the agents only heard "a very short" portion of the conversation as it occurred, and none of the agents testified about the tape's chain of custody. The only evidence concerning the tape's authenticity was Agent Glynn's testimony that he equipped Bolden with a recording device before the conversation with Eberhart, that he removed the recording device after the conversation, and that the voices on the tape were Bolden's and Eberhart's.

Though we question whether this is clear and convincing evidence that Government Exhibit 8 truly and accu-

rately recorded the conversation that occurred between Eberhart and Bolden, the plain error doctrine requires Eberhart to show that the error was obvious and that it affected his substantial rights. *See United States v. Olano*, 507 U.S. 725, 734 (1993); *United States v. McGee*, 60 F.3d 1266, 1272 (7th Cir. 1995) ("The error must be clear under current law."). He has not satisfied either requirement. Indeed, he has not cited (and we have not found) any decision in which we have held that a tape recording was not properly authenticated at trial. In addition, our previous rulings indicate that district courts have broad discretion in determining whether tape recordings have been authenticated. *See United States v. Welch*, 945 F.2d 1378, 1383 (7th Cir. 1991). Consequently, the error was not obvious.

Nor has Eberhart established that the admission of Government Exhibit 8 affected the outcome of the proceedings. *See Olano,* 507 U.S. at 734. Even without the contents of this recording, the government had strong evidence that Eberhart conspired to possess cocaine. It offered the phone calls between Bolden and Eberhart, Eberhart's presence at the meeting with Bolden outside Kentucky Fried Chicken, Eberhart's confession, phone calls between Tommy and Eberhart, and tools of drug-dealing found in the garage where Eberhart said that Tommy stored his drugs. Given this evidence, the admission of Government Exhibit 8 was not plain error.

Eberhart also argues that the statements on the tapes were inadmissible hearsay. The Court rejects the argument. Eberhart's statements were admissions, which the district court properly admitted under Federal Rule of Evidence 801(d)(2). Bolden and Tommy's statements were not hearsay because they were admitted, not for the truth of the matter asserted, but to place Eberhart's statements in context. *See United States v. Gajo*, 290 F.3d 922, 929-30 (7th Cir. 2002) (collecting cases).

## D. Sufficiency of the Evidence

Eberhart's last argument is that the government did not offer sufficient evidence to support Eberhart's conviction for conspiracy or to support the district court's sentencing determination that the conspiracy involved more that five kilograms of cocaine. To prove a conspiracy between Eberhart and Bolden, the government needed to show more than a series of spot sales, because buying and selling drugs, without more, does not constitute a conspiracy. *See United States v. Thomas*, 284 F.3d 746, 752 (7th Cir. 2002). Rather, the government had to prove "an understanding—explicit or implicit—among co-conspirators to work together to commit the offense." *United States v. Medina*, 430 F.3d 869, 881 (7th Cir. 2005). Factors indicating a drug conspiracy include transactions that involve large quantities of drugs, prolonged cooperation between parties, standardized dealings, and sales on credit. *United States v. Berry*, 133 F.3d 1020, 1023 (7th Cir. 1998).

In this case, the government presented ample evidence that Eberhart dealt in large quantities of drugs, bought and sold drugs on credit, and cooperated with Bolden over a significant period of time. First and foremost, Eberhart confessed to dealing forty kilograms of cocaine per month for a period of one year and to receiving drugs from Tommy on credit. Though Eberhart disputes the reliability of his confession, it was corroborated—at least in part—by the money counting machine, gun, and scales found at the stash house where Eberhart said that Tommy stored his drugs. In any event, the reliability of the confession was a determination for the jury to make. Additionally, Eberhart's taped conversations suggested that he provided Bolden with $40,000 worth of drugs on credit, and phone records established that Eberhart had called Bolden 196 times in the six months prior to his arrest. This evidence amply supported Eberhart's conviction for conspiracy to distribute or possess cocaine. It also supported the district court's

conclusion that Eberhart was responsible for distributing five or more kilograms of cocaine.[1]

### III.  Conclusion

For the reasons stated above, we AFFIRM the judgment of the district court.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

[1] Eberhart makes three additional arguments which he concedes we previously rejected. Def. Reply at 6. We decline to revisit those issues.