In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 18-2035

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ARTEZ BREWER,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:16-cr-00084-JVB-JEM-1 — **Joseph S. Van Bokkelen**, *Judge.*

———————————

ARGUED NOVEMBER 5, 2018 — DECIDED FEBRUARY 4, 2019

———————————

Before BAUER, ROVNER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Artez Brewer and his girlfriend, Robin Pawlak, traveled the country robbing banks, à la Bonnie and Clyde. Agents today, however, have investigative tools that their Great Depression predecessors lacked. With a warrant for real-time, Global-Positioning-System (GPS) vehicle monitoring, a task force tracked Brewer's car to California where he and Pawlak committed another robbery. Brewer was arrested and essentially confessed to the crime spree.

The government charged him with three counts of bank robbery, 18 U.S.C. § 2113(a), and a jury convicted him on each count.

Brewer appeals. He argues that the government violated the Fourth Amendment by tracking him to California when the warrant only permitted monitoring in Indiana. But the in-state limitation did not reflect a probable-cause finding or a particularity requirement, and the Fourth Amendment is unconcerned with state borders. Brewer also argues that the district court abused its discretion in admitting evidence of unindicted robberies. Yet that other-act evidence was directly probative of Brewer's identity, modus operandi, and intent, and it therefore fell within the bounds of Federal Rule of Evidence 404(b)(2). We affirm.

## I. Background

Five bank robberies, committed in three states over the course of about six weeks, led to Artez Brewer's arrest and prosecution.

The first robbery happened on April 28, 2016. The day before, a young man entered Centier Bank in Griffith, Indiana, and made an odd request: he asked for change in two-dollar bills. The next day, a woman walked into the bank wearing a jogging suit, gloves, and a mask while carrying a yard-long wooden stick, a black bag, and a note. She put the stick in between the bank's entrance doors, approached the teller counter, and held up the note, which read, "All money in drawer, no bait." She received $162, exited the bank, and ran into the alley. Security footage showed a dark Chevrolet Impala fleeing the scene.

The day after the first robbery, on April 29, 2016, a young man walked into State Bank & Trust in Perrysburg, Ohio. He lingered, waited in line for a couple of minutes, pulled out his cell phone, and left without being assisted. The man was then seen loitering across the street from the bank. After relieving himself on a nearby garbage bin, the man got back into his car—a black sedan—where he sat facing the bank. A bit later, a woman entered the bank dressed head to toe in dark clothing, carrying a stick, a black bag, and a note. The woman dropped the stick at the bank's entrance doors, approached the teller counter, and handed up a note demanding cash. She left with over $1,000.

On the morning of May 6, 2016, a young man entered the MainSource Bank in Crown Point, Indiana. He approached the teller and made a request she thought odd: change in two-dollar bills. That afternoon, a beige Toyota sedan pulled up near the bank. A woman got out, wearing all black and carrying a long stick, a purple and black bag, and a note. She put the stick at the front doors, reached the teller desk, and held up a note demanding money. She received all the money in the teller's top drawer, about $1,700. She fled, got back into the Toyota, and took off.

About three weeks later, in the late afternoon of May 26, 2016, a young man walked into Horizon Bank in Whiting, Indiana. He approached the teller desk and requested change in one-dollar gold coins, which the teller found unusual. The next morning, on May 27, a Toyota Corolla pulled up to an auto-shop lot next to the bank. A woman dressed in dark clothing entered the bank, carrying a bag and a note. Without saying a word, she approached the teller desk and held up the note demanding money. She made off with a lit-

tle more than $6,000 before jumping into the Toyota. The robber left behind a stick wedged between the doors.

These (and other) heists drew the attention of an FBI task force, which pinned Brewer as the young man present at the banks just before the robberies. It conducted surveillance and gathered that Brewer lived with a woman, Robin Paw-lak, in Gary, Indiana. Officers observed a Toyota matching the one from the robberies parked outside their residence, and they later discovered that Brewer sometimes drove an-other car—a silver Volvo. A task-force officer sought a war-rant from a state-court magistrate to monitor the Volvo with GPS tracking. The officer's supporting affidavit referenced eleven bank robberies, in Indiana, Illinois, and Ohio. The magistrate issued the warrant, which permitted the use of a "tracking device … in any public or private area in any ju-risdiction, *within the State of Indiana*, for a period of 45 days." The in-state limitation was, apparently, an anomaly. The task force had obtained multiple GPS vehicle-monitoring war-rants during the investigation from the same magistrate, none of which included the limitation.

The task force quickly installed the GPS tracker, con-sistent with the warrant's terms. A few days later, on June 7, 2016, a task-force officer noticed that the Volvo was on the move heading west. He monitored the car as it left Indiana and traveled through Illinois and continued westward until it arrived in Los Angeles, California. The officer was una-ware that the warrant limited the monitoring to Indiana, and he failed to consult it while tracking the car. Once in L.A., the officer noticed that the Volvo was circling a bank.

The officer called the FBI's bank-robbery coordinator in L.A. to give him the heads-up about Brewer's presence near

Banner Bank. On the morning of June 10, 2016, officers ob-
served Brewer and Pawlak in the Volvo near the bank. Brew-
er got out of the car, walked around the bank for about thirty
minutes, occasionally staring through its large windows.
That afternoon, the Volvo again approached the bank. A
woman got out of the car, dressed in black and carrying a
stick. She dropped the stick at the door, approached the tell-
ers, and held up a note, which read, "ALL the money No
cops No DYE OR your dead." She received about $1,000 in
cash, and then ran out of the bank and into the Volvo. Offic-
ers stopped the car, arrested Brewer and Pawlak, and found
a bag of cash.

Agents questioned Brewer at the stationhouse. They told
him that he was seen at Horizon Bank in Indiana just before
it was robbed, but Brewer claimed to be a coin collector.
When an agent pressed, however, and asked whether any-
one else was involved in the robberies, Brewer said:

> I tell you what, I can tell you, I told you about this
> shit, I didn't come up with it by my damn self, I can
> tell you that shit right now but like, ya know. I was
> not uh—I was not uh—It was like a spur of the
> moment shit like fuck ya know….

Agents later searched Brewer's residence. They found car
titles to an Impala and a Corolla. They also found clothes
matching those worn by the young man who had been pre-
sent before many of the robberies.

A grand jury returned an indictment against Brewer
charging him with three counts of bank robbery, 18 U.S.C.
§ 2113(a), for each of the three Indiana robberies. After
Brewer lost a motion to suppress regarding, in part, the
tracking of his Volvo outside of Indiana, he went to trial. At

trial, and over Brewer's objection, the government presented evidence of the Ohio and California robberies pursuant to Rule 404(b). Eyewitness testimony identified Brewer as the young man present before many of the robberies, and surveillance footage showed the same. The government also presented a recording of Brewer's post-arrest statements.

The jury convicted Brewer on all three counts, and the district court sentenced him to 137 months in prison. He had already been convicted in the Central District of California for the L.A. robbery, and sentenced to 125 months in prison for that crime. The net effect of the district court's sentence below was therefore an additional twelve months in custody. Brewer appealed.

## II. Discussion

Brewer offers three reasons for a new trial: (1) the district court should have excluded certain evidence under the Fourth Amendment; (2) the district court erred in admitting evidence of the unindicted robberies under Rule 404(b); and (3) the government used surveillance-footage evidence that had questionable authenticity under Rule 901. We address these points in turn and conclude that none merits reversal.

## A. The Fourth Amendment and the Tracking Warrant

GPS vehicle monitoring generally requires a warrant, *United States v. Jones*, 565 U.S. 400, 404 (2012), and the government obtained one here. Brewer argues that by not abiding by the in-state limitation set forth in the warrant the government effectively conducted a warrantless search, so the evidence of the California robbery and his confession were fruits of the poisonous tree. *See Wong Sun v. United States*,

371 U.S. 471, 488 (1963). Two principles of the Fourth Amendment lead us to disagree.

The first is that violating a search warrant is not the same as violating the Fourth Amendment. We know from as far back as *Marron v. United States*, 275 U.S. 192, 196 (1927), that officers generally cannot search more than the particular places or things described in the warrant, and that they violate the Fourth Amendment if they do. *See also Horton v. California*, 496 U.S. 128, 140 (1990); *United States v. Mann*, 592 F.3d 779, 782 (7th Cir. 2010). That rule makes sense: the Fourth Amendment entrusts judges, not law enforcement, to determine the particular places and things that probable cause justifies searching and seizing. But not everything in a warrant is so inviolable. In *Richards v. Wisconsin*, 520 U.S. 385, 395–96 (1997), for example, the Supreme Court held that a no-knock search was reasonable even though the warrant expressly declined to authorize no-knock entry. Courts, similarly, have held that reasonable noncompliance with a warrant's time limitations does not offend the Fourth Amendment. *See, e.g.*, *United States v. Burgess*, 576 F.3d 1078, 1097 (10th Cir. 2009); *United States v. Gerber*, 994 F.2d 1556, 1558–59 (11th Cir. 1993); *see also United States v. Martin*, 399 F.3d 879, 881 (7th Cir. 2005). This, too, makes sense: while the Fourth Amendment entrusts judges to authorize the particular places or things to be searched, it does not require judges to constrain officers with other "unenumerated" particularities. *See United States v. Grubbs*, 547 U.S. 90, 97–98 (2006); *Dalia v. United States*, 441 U.S. 238, 255–58 (1979); *see also United States v. Patrick*, 842 F.3d 540, 544 (7th Cir. 2016); *Shell v. United States*, 448 F.3d 951, 957 (7th Cir. 2006).

The second Fourth Amendment principle is similar. Like certain warrant terms, state law does not by proxy heighten the Fourth Amendment's protections. *See Virginia v. Moore*, 553 U.S. 164, 168–73 (2008); *California v. Greenwood*, 486 U.S. 35, 43–44 (1988). If, for example, law enforcement executes a state-issued warrant beyond the limits of state law, the search may nevertheless comply with the Fourth Amendment. *See United States v. Gilbert*, 942 F.2d 1537, 1541–1542 (11th Cir. 1991). We recognized as much in *United States v. Castetter*, 865 F.3d 977, 978–79 (7th Cir. 2017), where we put it simply: "the Fourth Amendment does not concern state borders."

Other courts have applied these Fourth Amendment principles to cases like this one. In *United States v. Faulkner*, 826 F.3d 1139 (8th Cir. 2016), *cert. denied*, 137 S. Ct. 2092 (2017), for example, the Eighth Circuit held that the installation of a GPS tracker outside of the county where the warrant authorized the installation to occur did not implicate the Fourth Amendment. That the installation violated the warrant and state law was irrelevant, according to *Faulkner*, because the Fourth Amendment's requirements of probable cause and particularity were satisfied. 826 F.3d at 1145–46. Even more on point is *United States v. Simms*, 385 F.3d 1347 (11th Cir. 2004) (Cudahy, J., sitting by designation). In *Simms*, the Eleventh Circuit held that the GPS tracking of a vehicle into Alabama, even though the authorizing court order only allowed tracking in Texas, did not violate the Fourth Amendment. The Fourth Amendment's requirements were met, and the warrant's in-state limitation was, at most, a state-law problem. *Simms*, 385 F.3d at 1355–56.

We hold the same. Upon a good-faith affidavit, the warrant to track Brewer's car issued from (1) an independent magistrate, (2) based on probable cause, (3) with a particular description of the place or thing (the Volvo) to be searched. Brewer therefore received all he was entitled to under the Fourth Amendment. *E.g.*, *Dalia*, 441 U.S. at 255; *Archer v. Chisholm*, 870 F.3d 603, 614 (7th Cir. 2017).

Brewer nevertheless submits that the task force should have obeyed the in-state limitation. Yet he does not argue that it reflected a constitutional requirement—that is, a probable-cause determination or a description of the particular search authorized. *Cf. Horton*, 496 U.S. at 140. For good reason: Judges must describe the specific person, phone, or vehicle to be tracked to satisfy the Fourth Amendment's particularity requirement. They need not specify (or limit) the tracking to a geographic location. *United States v. Sanchez-Jara*, 889 F.3d 418, 421 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 282 (2018); Wayne R. LaFave, 2 SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 4.5(e) (5th ed. 2018). Nor was there any reason to do so here. The affidavit supporting the warrant in this case described a multistate bank-robbery spree, and we do not see how such evidence could justify monitoring only within Indiana. Brewer may have had a constitutionally protected privacy interest in his whereabouts, *see Carpenter v. United States*, 138 S. Ct. 2206, 2215–17 (2018), but that interest was no greater on Indiana roads than it was on Illinois or California roads.

What we are left with, then, is the task force's noncompliance with a state-based, ancillary restriction in the warrant.[1] The Fourth Amendment gives no remedy for that.

## B. Rule 404(b) and the Unindicted Robberies

Brewer also submits that the district court erred in admitting evidence of the unindicted robberies in Ohio and California under Federal Rule of Evidence 404(b). We review Rule 404(b) decisions, like most evidentiary decisions, for an abuse of discretion. *United States v. Norweathers*, 895 F.3d 485, 490 (7th Cir. 2018).

Rule 404(b)(1) bars evidence of uncharged misdeeds to prove that the defendant had a propensity for committing crime. Rule 404(b)(2), on the other hand, permits the introduction of such evidence for other purposes, including to prove identity, modus operandi, or intent. Fed. R. Evid. 404(b)(2); *United States v. Carson*, 870 F.3d 584, 599 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 2011 (2018). In *United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014) (en banc), we set the roadmap for determining which camp a particular piece of other-act evidence falls into. Per *Gomez*, after a Rule 404(b) objection, the proponent of the other-act evidence must demonstrate that the evidence is relevant to a legitimate purpose "through a chain of reasoning that does not rely on the forbidden inference that the person has a certain charac-

---

[1] We do not know for certain why the warrant included the in-state limitation. Perhaps there were state-law reasons, although neither party has pointed to any, or perhaps, as counsel for the government suggested at oral argument, the limitation was a vestige from some stock template. The answer is unimportant. On this record, we can rule out the only reasons that would matter—a probable-cause finding or a particularity requirement.

ter and acted in accordance with that character on the occasion charged in the case." 763 F.3d at 860. If the proponent does so, the district court must then use Rule 403 to determine "whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice," taking into account "the extent to which the non-propensity fact for which the evidence is offered actually is at issue in the case." *Id.; see also United States v. Thomas*, 897 F.3d 807, 813 (7th Cir. 2018).

The district court followed course in admitting evidence of the Ohio and California robberies. The government offered that other-act evidence to prove identity through modus operandi and to show Brewer's intent. *See Gomez*, 763 F.3d at 864. It supplied propensity-free reasoning for those purposes, too. That Brewer lingered around banks in Ohio and California just before they were robbed by a person clothed head to toe, who used a stick and a give-me-the-cash note, makes it more likely that he was the individual recorded at the Indiana banks just before they were robbed by a person who dressed similarly and used similar methods. That is so not because Brewer has a propensity for committing crimes, or even bank robberies, but because he and his partner had established an idiosyncratic way of doing so. *See United States v. Price*, 516 F.3d 597, 603–04 (7th Cir. 2008); *United States v. Smith*, 103 F.3d 600, 603 (7th Cir. 1996).

Urging a different conclusion, Brewer points out dissimilarities among the robberies. In California, for example, the robber dropped the stick at the door, rather than jamming it in between the doors. And in neither Ohio nor California did he make a strange change request, as he did before the Indiana robberies. Our cases, however, have considered modus

operandi to mean a "distinctive"—not identical—"method of operation." *Carson*, 870 F.3d at 599; *see also, e.g., United States v. Robinson*, 161 F.3d 463, 468–69 (7th Cir. 1998); *United States v. Hudson,* 884 F.2d 1016, 1021 (7th Cir. 1989). Brewer identifies slightly different tactics, but those differences do not undermine the distinct resemblance among the robberies.

The district court also properly weighed the evidence under Rule 403, as *Gomez* requires. Brewer offered two lines of defense at trial—that he was not the person identified before the Indiana robberies, and that, even if he was, he was there for the innocent purpose of obtaining gold coins and two-dollar bills. He repeatedly cross-examined eyewitnesses on these topics and made the arguments in closing. Brewer's identity and intent were therefore central to the case. *Gomez*, 763 F.3d at 857, 860; *cf. United States v. Miller*, 673 F.3d 688, 697 (7th Cir. 2012). For reasons we just explained, the other-act evidence was probative of his identity as the person present at the Indiana banks. It was equally probative in showing that he was there for bank-casing purposes, not numismatic ones. The evidence of the Ohio and California robberies was of course prejudicial—all other-act evidence is—but given that Brewer put his identity and intent squarely at issue, it was not unfairly so. *See* Fed. R. Evid. 403.

Brewer takes an additional issue with the evidence of the Ohio robbery, arguing that there was not enough proof tying him to it. There was plenty. A State Bank & Trust teller authenticated surveillance footage (as we discuss below) that depicted a man resembling Brewer. What is more, a man with his appearance, wearing clothes matching what the man who lingered in the bank wore, was seen loitering

across the street for so long that he needed to relieve his bladder next to his car, a car which matched a title found in Brewer's home.

Brewer also makes a passing challenge to the jury instructions, but we see no problem there either. The district court twice instructed the jury to consider the evidence of the Ohio and California robberies only if it first found that Brewer likely participated in them. *See* Pattern Criminal Jury Instructions of the Seventh Circuit 3.11 (2012 ed.). The court further made clear that the jury could only use the evidence to help it decide "the defendant's motive, intent, knowledge and modus operandi during" the charged robberies— precisely as Rule 404(b)(2) allows.

On the whole, the district court showed sensitivity to Rule 404(b)'s pitfalls throughout the prosecution. It excluded evidence of Brewer's conviction for the California robbery. It did the same for several arrest photos of Brewer and Pawlak. In admitting the other-act evidence that it did, the district identified the propensity-free chain of reasoning and carefully performed the Rule 403 balancing. There was no abuse of discretion.

## C. Rule 901 and Footage of the Ohio Robbery

Brewer's third and final challenge concerns the government's evidence of the Ohio robbery. He contends that the government did not properly authenticate surveillance footage of his presence at State Bank & Trust a few hours before the robbery. We review the district court's contrary decision for an abuse of discretion. *See Mathin v. Kerry*, 782 F.3d 804, 812 (7th Cir. 2015).

A party seeking to admit evidence must first establish a foundation for its authenticity. *United States v. Fluker*, 698 F.3d 988, 999 (7th Cir. 2012); *United States v. Emerson*, 501 F.3d 804, 813 (7th Cir. 2007). Federal Rule of Evidence 901 states that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Rule 901 does not expressly describe how videotape evidence may be authenticated, but we have held that the government can authenticate a recording "by offering testimony of an eyewitness that the recording accurately reflects" the events as they occurred. *United States v. Eberhart*, 467 F.3d 659, 667 (7th Cir. 2006); *see also United States v. Cejas*, 761 F.3d 717, 723 (7th Cir. 2014). That is what the government did here. It called Sarah Felzer to testify, the teller on duty when Brewer visited State Bank just before the robbery. She testified that the footage "fairly and accurately depict[ed] the events as they happened" that day.

On cross-examination, Felzer's recollection seemed foggier. She testified that she did not have an "independent recollection" of that day, and she seemed to suggest that she could not distinguish that day from any other day that Brewer visited the bank. Brewer is right that this testimony was inconsistent with Felzer's direct-examination testimony. But he is wrong to think it required exclusion of the footage. Felzer's initial testimony was clear and sufficient under Rule 901, *see Eberhart*, 467 F.3d at 667, so the district court did not abuse its discretion in finding that the government met its threshold burden. It fell to the jury to decide "the evidence's true authenticity and probative value." *Fluker*, 698 F.3d at 999.

Even if it were otherwise, we would find harmless error. Fed. R. Crim. P. 52(a). Take away the footage of Brewer at State Bank and the jury still heard about his confession and his all-too-coincidental presence at the four other banks just before they were robbed. It heard five tellers—from the Indiana robberies alone—identify Brewer. The jury also heard about the compelling evidence the government recovered from Brewer and Pawlak's home, including titles for vehicles that matched the getaway cars. The government's case would not have been made significantly less persuasive absent the State Bank footage. *See, e.g.*, *United States v. Jett*, 908 F.3d 252, 267 (7th Cir. 2018).

### III. Conclusion

There was no Fourth Amendment violation in the task force's execution of the warrant. There was no error in the district court's evidentiary decisions. We AFFIRM the district court's judgment.