In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1216

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN BUNCICH,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:16-cr-00161-JTM-JEM-1 — **James T. Moody**, *Judge.*

ARGUED MARCH 26, 2019 — DECIDED JUNE 5, 2019

Before BAUER, ROVNER, and BRENNAN, *Circuit Judges*.

BAUER, *Circuit Judge.* John Buncich was the Sheriff of Lake
County, Indiana. He was charged by a grand jury with five
counts of wire fraud and one count of accepting bribes. He was
found guilty on all six counts. For the reasons that follow, we
vacate his conviction on Counts I-III, affirm as to Counts IV-VI,
and remand for resentencing.

**BACKGROUND**

John Buncich was elected Sheriff of Lake County, Indiana, and took office on January 1, 2011. He named Timothy Downs his Chief of Police, the highest ranking officer under the sheriff. The sheriff was responsible for providing the county police with towing services. Buncich created a list of twelve tow operators and assigned each to a defined territory. Some operators were assigned to specific police units and some were responsible for completing certain assignments such as heavy towing—the towing of semi trucks and other large vehicles. Buncich was the final decision maker regarding territories and assignments.

Buncich held an annual campaign fundraiser called "Summer Fest" and directed Downs and other subordinates to sell tickets to the event. Towing companies were specifically targeted by the individuals selling tickets.[1] Downs collected the ticket sales revenue and gave it to Buncich; he testified that he would not have kept his job if he refused to sell tickets.

The county's second largest tower was Willie Szarmach of CSA Towing. Szarmach and CSA contributed to Buncich to ensure a spot on the tow list. During the campaign Szarmach gave $500 cash to Buncich through an intermediary and CSA gave the campaign a check for $2,000, the maximum allowed by Indiana law. (Szarmach also gave cash above that limit.) After the election, Buncich assigned Szarmach light and heavy

---

[1] When Buncich was elected the Lake County Democratic Chairman in 2014, he also instructed Downs to sell tickets to Democratic party fundraisers.

towing territories near Gary, Indiana. CSA was assigned gang unit towing shortly after Szarmach gave $1,000 cash to Buncich; CSA was also given towing territory assigned to other companies whose owners either paid only by check or declined to buy tickets entirely.

Scott Jurgensen, who owned Samson Relocation & Towing, was assigned the auto theft towing detail. About five months after Samson began towing, Downs approached Jurgensen about making payments. The two largest towers told Jurgensen they were paying off Buncich.

On April 8, 2014, Jurgensen met with Downs at a restaurant. (Unbeknownst to Downs, Jurgensen had become a confidential informant for the FBI.) Jurgensen told Downs he would pay "five hundred cash, two thousand dollar check like I did last time." He asked Downs if he could get a rival company's territory for another $2,500. Downs told him everything was "fair game" after the upcoming Democratic primary in May. Jurgensen gave him a check and cash; Downs said that he would "still need more after May."

In June, Jurgensen and Szarmach met with Downs and expressed an interest in increasing their territory. They asked if Buncich was planning on "trim[ming] down the flock." Downs said "some people that weren't very friendly [will] probably bite the dust," but they would likely have to wait until after the November election to get more of the auto detail. Szarmach said he could provide $10,000 with no paper trail.

The trio met again on October 8, 2014, when Downs told Jurgensen he was selling Democratic fundraiser tickets. Downs said he did not "like to pressure anybody into anything" and

that a purchase "don't gotta be big." He also said he no longer sold tickets to S & S, another towing company, because he believed its owner tried to record him.

The next day Downs informed Jurgensen and Szarmach that Buncich had decided to take all heavy towing away from S & S and give it to Szarmach. He also showed them fundraiser tickets that Buncich was "real interested in" and they agreed to pay $2,500. On October 14, 2014, Jurgensen and Szarmach each gave Downs $500 cash and a check for $2,000 made out to the Lake County Central Democratic Committee. When they asked how much the county's largest tower, Jerry Kundich had paid, Downs said that Kundich dealt with Buncich directly.

Buncich sent out an email regarding "CSA's newly revised towing district" on June 1, 2015. Two days later Jurgensen provided Downs with $2,500 cash for twenty-five tickets to Buncichs's campaign fundraiser. He asked if he would be "safe and left alone on the Lake County tow list" and Downs assured he would be until Downs himself ran for sheriff. After the meeting Downs was confronted by FBI agents and agreed to cooperate with the investigation.

A few days later Downs met with Szarmach and Kundich who each gave him $2,500 cash. On July 15, 2015, Downs gave $7,500 he had collected from Jurgensen, Szarmach, and Kundich to Buncich. When Downs asked Buncich about Jurgensen he responded that he "don't have to worry about nothing."

In March 2016, Buncich met Jurgensen and Szarmach at the Delta Restaurant. Szarmach desired a newly available towing assignment related to Gary ordinance enforcement. Buncich

said he was removing one of their competitors, DC Towing, from the list and that "[y]ou take care of your friends."

On April 22, 2016, Jurgensen and Szarmach paid Buncich for the Gary towing assignment. The men parked their trucks at Delta. After Buncich pulled into the parking lot Szarmach stepped out of his truck and left the door open with $3,500 cash resting on the driver's seat. He asked Buncich, "Did you see my new truck?" and Buncich took the envelope off the seat. Jurgensen, less theatrically, handed Buncich an envelope with $2,500, which he pocketed. During lunch, Szarmach asked Buncich for a towing assignment with the Indiana University Northwest campus police. Buncich agreed and Szarmach was later informed that he was on the University tow list.

Jurgensen and Szarmach complained that the officer in charge of Gary code enforcement, Niko Zairis, had not called in many tows. Buncich told them they did not have to pay the county a $50 franchise fee on tows; Szarmach responded that not paying the fee would allow for more "sponsorship."

On July 21, 2016, the trio once again met at Delta where Jurgensen gave Buncich $2,500 cash. Buncich asked if they wanted any tickets; Szarmach asked for 25 and Jurgensen declined. Szarmach said he would also give Buncich a $1,000 check and $2,500 cash at the fundraiser. Szarmach asked what Buncich could do for Jurgensen in the New Chicago territory, which Jurgensen shared with Tow Central. Tow Central was soon removed from the New Chicago towing list, leaving the entire territory to Jurgensen. The trio also discussed replacing Zairis. Buncich addressed the money problem by assigning an

officer to spend five days a week searching for cars to tow in Gary.

On September 2, 2016, Jurgensen met Buncich at Delta. He gave Buncich $7,500 cash and asked him to ensure that he remained the sole tow company on the New Chicago list. Buncich pocketed the envelope and said, "We'll make it work. You got it." Buncich asked Jurgensen to "do 500" for a fundraiser for Indiana gubernatorial candidate John Gregg and to not say anything to Szarmach about the meeting.

On October 20, 2016, Buncich met with Jurgensen and Szarmach to sell them tickets to a Democratic fundraiser. When they said they were going to "do the right thing" Buncich said he was "gonna cut down the numbers here, the firms."

In November 2016 the FBI searched Buncich's home and office, and Szarmach's business locations. Agents found four used and thirteen unused money bands in denominations of $1,000, $2,000 and $5,000.

Buncich was charged and convicted of five counts of wire fraud pursuant to 18 U.S.C. § 1343 and § 1346. Counts I-III relied on "Federal Reserve payroll funds transfer[s]" dated May 5, 2014, November 17, 2014, and August 10, 2015. Counts IV and V relied on JP Morgan Chase wire transfers dated April 8, 2014, and October 21, 2014. The Chase wire transfers correspond to the two $2,000 checks paid by Jurgensen. Buncich was also convicted in Count VI, of bribery in violation of 18 U.S.C. § 666(a)(1)(B). The indictment stated that Buncich had deprived Lake County of the $50 franchise fees for the Gary ordinance tows.

Buncich argues on appeal that the government failed to introduce sufficient evidence to convict on the five wire fraud counts. Buncich also argues that the district court erred in admitting Exhibit 49.2, a chart showing $58,100 in cash deposits into Buncich's jointly-held bank account. Buncich also appeals admission of the testimony of IRS Agent Gerard Hatagan in laying a foundation for the chart and testifying that deposits with no explained source were likely from criminal activity.

### A. Honest Services Wire Fraud

### 1. Legal Standard

We will reverse a conviction only where the record, viewed in the light most favorable to the government, is "devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Durham*, 645 F.3d 883, 892 (7th Cir. 2011), cert. denied, 132 S. Ct. 1537 (2012). To establish wire fraud under 18 U.S.C. § 1343, the government must prove the defendant (1) participated in a scheme to defraud, (2) intended to defraud, and (3) used interstate wires in furtherance of the fraud. *United States v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012) citing *United States v. Green*, 648 F.3d 569, 577–78 (7th Cir. 2011). An honest services fraud scheme covers only bribery or kickbacks. *United States v Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015). To prevail, the government must show that the bribe in question "entail[ed] a plan to change how the employee or agent does his job." *Id.*

### 2.  Analysis

Both parties agree the evidence presented to the trial court failed to establish the wire transfers that were the basis of Counts I-III. Buncich's conviction on Counts I–III is hereby reversed.

Sufficient evidence, however, supports Buncich's wire fraud convictions on Count IV and Count V. Buncich argues that the wire transfers dated April 8, 2014, and October 21, 2014, were not proven to be "anything more than a campaign contribution." On the contrary, from the record here a rational jury could conclude that these payments were made to Buncich in exchange for official acts. "The exchange of an official act for money violates federal law, no matter how the recipient uses the cash." *United States v. Smith*, 816 F.3d 479, 480 (7th Cir. 2016).

Jurgensen testified that donating to the Buncich campaign was necessary to maintain his towing assignments. After Jurgensen gave the check in April 2014, Buncich assured Downs that Jurgensen "don't have to worry about nothing." Other towing companies who failed to buy their full allotment of campaign tickets had territory taken away.

Downs told Jurgensen and Szarmach that Buncich intended to remove towing companies and that those who "weren't very friendly" would "probably bite the dust." Szarmach and Jurgensen gave Downs $1,000 cash plus checks including the one described in Count V. Buncich then moved the heavy tow boundary, increasing Szarmach's tows and the profits of both men.

The jury concluded that the April 2014 check was a quid pro quo bribe for maintaining Jurgensen's territory. It also concluded that the October 2014 check was given in exchange for expanding the heavy tow boundary for Szarmach. These conclusions were rationally based on the evidence presented, and the guilty verdict is affirmed as to Counts IV and V.

## B. Rule 404(b) Evidence

### 1. Legal Standard

Rule 404(b) excludes evidence of other crimes, wrongs, or acts if the purpose is to show a person's propensity to behave in a certain way, but other-act evidence may be admitted for "another purpose" including, but not limited to, "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014) (en banc). The Rule excludes evidence if its relevance to "another purpose" is established only through the forbidden propensity inference. *Id.* at 856. The admission must be supported by some "propensity-free chain of reasoning." *Id.* The district court "should not just ask *whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference." *Id*.

If the proponent demonstrates that the evidence is relevant to a legitimate purpose, the district court must then use Rule 403 to determine "whether the probative value of the other-act evidence is substantially outweighed by the risk of unfair prejudice," taking into account "the extent to which the

non-propensity fact for which the evidence is offered actually is at issue in the case." *United States v. Brewer*, 915 F.3d 408, 415 (7th Cir. 2019).

We review Rule 404(b) decisions for an abuse of discretion. *United States v. Norweathers*, 895 F.3d 485, 490 (7th Cir. 2018) (citing *United States v. Schmitt*, 770 F.3d 524, 532 (7th Cir. 2014)). Under this standard we will defer to the district court "unless no reasonable person could adopt its view." *Id*. Even if we make such a finding, reversal is only warranted "if the average juror would find the prosecution's case significantly less persuasive without the improper evidence." *Id*.

### 2. Analysis

Exhibit 49.2 was a chart showing that $58,100 in cash was deposited into Buncich's jointly-held account between April 2014 and September 2016. Agent Hatagan laid a foundation for the admission of the exhibit. Hatagan also reviewed Buncich's income and concluded that the source of the cash was illegal activity—Hatagan could not find any legitimate source for the cash.

The district court initially denied the government's motion to admit Exhibit 49.2. The court concluded that the deposits into Buncich's account were too "remote in time, that they can't possibly bear any relevance to the alleged bribes" and "the amounts vary too wildly from the alleged bribes to be probative." The court also noted that "the danger of unfair prejudice to the Defendant and the danger of misleading the jury and causing them to speculate and concern themselves with matters unrelated to this case, [is] just too great for me to admit it." The court then limited the allowed evidence to those

deposits related to the $26,000 paid by Jurgensen and Szarmach between April 8, 2014, and September 22, 2016.

Buncich took the stand in his own defense. He denied ever taking bribes and claimed that Downs never gave him cash from Jurgensen or Szarmach. He also denied taking the $3,500 off the seat of Szarmach's truck. The government filed a new motion to admit Exhibit 49.2, seeking to introduce the chart to rebut Buncich's testimony regarding how he handled payments. The court granted the government's motion and admitted Exhibit 49.2 into evidence.

Unexplained wealth evidence is admissible where (1) the evidence presented creates an inference that the defendant was involved with the crime; (2) the unexplained wealth was acquired during the period in which the crime allegedly occurred; and (3) the government presents other evidence to support the charge, including evidence that the income was not obtained through legitimate means. *United States v. Cardena*, 842 F.3d 959, 983 (7th Cir. 2016). Relying on a series of cases mostly involving large scale drug conspiracies, the district court concluded that "large unexplained amounts of cash are indicative of criminal activity." *See United States v. Hogan*, 886 F.2d 1497 (7th Cir. 1989), *United States v. Penny*, 60 F.3d 1257 (7th Cir. 1995), *United States v. Harris*, 536 F.3d 798, 811 (7th Cir. 2008). The court concluded that "the highly probative value of this evidence for purposes of rebutting the defendant's self-described practices regarding his handling of cash is not outweighed by any danger of unfair prejudice to the defendant." We disagree.

The prejudice substantially outweighed the probative value of the exhibit, particularly when considered in conjunction with Hatagan's testimony that money in the account was derived from illegal sources. The government presented no evidence that the money in excess of the $26,000 described in the indictment was an illicit gain from criminal activity. We required such evidence in *Cardena* and it is of particular importance here where the account at issue is a joint bank account. As the deposits shown in the chart were well in excess of the amount of bribes Buncich was charged with, the exhibit and Hatagan's testimony were propensity evidence not submitted for any purpose permitted by Rule 404(b).

The court's mistake in admitting Exhibit 49.2 and Agent Hatagan's testimony was, however, harmless. "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *United States v. Stewart*, 902 F.3d 664, 683 (7th Cir. 2018) (citations omitted). The other evidence presented to the jury was extensive. Buncich was videotaped receiving large cash payments from Jurgensen and Szarmach. He subsequently increased Szarmach's heavy towing territory and directed his personnel to increase the amount of tows made under the "Gary ordinance towing" unit for the benefit of Jurgensen and Szarmach. Campaign records showed that the checks were deposited into campaign accounts, while the cash payments were not.

Buncich's explanations were not persuasive. He claimed he did not take the cash out of Szarmach's truck, but only leaned in to inspect it. Buncich claimed the $7,500 he received from

Jurgensen was actually an improperly documented campaign loan repayment, but other loan repayments were meticulously documented. Buncich also claimed that another $2,500 was paid by Jurgensen as a campaign donation, but that the cash payment was deposited in separate transactions with Jurgensen listed as an "anonymous" donor. The jury rejected these explanations. Determinations of a witness's credibility are to be made by the jury, and "we will not … second-guess the jury's credibility determinations." *United States v. Lawson*, 810 F.3d 1032, 1039 (7th Cir. 2016) .

The cash payments documented in Exhibit 49.2 and the testimony of Agent Hatagan would not have significantly altered the weight given to the rest of the evidence, nor would it have changed the mind of the average juror. The other evidence presented was sufficient to support the jury's guilty verdict.

## CONCLUSION

The district court's error  in the admission of the Rule 404(b) evidence was harmless, and the jury's guilty verdicts on Counts IV-VI are affirmed. The jury's guilty verdicts on Counts I-III are reversed, and the case is remanded for further action consistent with this opinion.