In the

# United States Court of Appeals

### For the Seventh Circuit

No. 19-2162

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*

*v.*

ROLAND PULLIAM,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16-cr-328 — **Sara L. Ellis**, *Judge*.

ARGUED MAY 20, 2020 — DECIDED SEPTEMBER 3, 2020

Before SYKES, *Chief Judge*, and RIPPLE and KANNE, *Circuit Judges*.

KANNE, *Circuit Judge*. Roland Pulliam was arrested after fleeing from two Chicago police officers. During the chase, both officers saw a gun in Pulliam's hand. Pulliam had previously been convicted of multiple felonies, making it a federal crime for him to possess a gun. The government charged him with possessing a firearm as a felon, 18 U.S.C. § 922(g)(1); Pulliam was convicted after a jury trial.

After Pulliam was sentenced, the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019), which clarified the elements of a § 922(g) conviction. Now, in addition to proving that the defendant knew he possessed a firearm, the government must also prove the defendant belonged to "the relevant category of persons barred from possessing a firearm." *Id.* at 2200. This knowledge-of-status element was not mentioned in the jury instructions at Pulliam's trial.

Pulliam now argues that the erroneous jury instructions and three evidentiary errors require the reversal of his conviction. But none of these alleged errors call for the reversal of Pulliam's conviction, so we affirm.

## I. BACKGROUND

In July 2015, Chicago Police Department Officers Victor Alcazar and Jason Guziec responded to a dispatch call that four black men were selling drugs near a fence a few blocks from the officers' location. Dispatch received this information from two anonymous 911 callers: the first caller reported seeing two drug transactions, while the other observed the men selling "something." As the officers drove to the reported sale, they noticed four black men standing together near a fence in a McDonald's parking lot. Officer Guziec parked the car and both officers approached the men to conduct a field interview.

The four men dispersed as the officers approached. One of the men—later identified as Roland Pulliam, an employee of a nearby auto body shop—walked between a parked van and the fence. When Pulliam emerged from behind the van, both officers saw a chrome gun in his hand. Officer Guziec yelled "gun" and drew his weapon. Pulliam then ran away from the

officers and into a nearby alley. A short way down the alley, Pulliam threw the gun, raised his hands, and allowed Officer Guziec to place him in handcuffs. Officer Guziec escorted Pulliam back to the squad car. Officer Alcazar, having seen where Pulliam threw the gun, went to retrieve it. He found the gun and an ejected magazine near the McDonald's dumpster.

After Pulliam's arrest, Officer Alcazar and other officers searched the parking lot for contraband. The officers found no guns (other than the one discarded by Pulliam) or narcotics in the area. Officer Guziec brought Pulliam to the station and searched him. Pulliam was carrying $408 in cash.

Almost one year later, a grand jury charged Pulliam with possessing a firearm as a felon, 18 U.S.C. § 922(g). Before trial, the government filed a motion *in limine* seeking a ruling on the admissibility of testimony related to the 911 calls that were relayed by dispatchers to Officers Alcazar and Guziec. Pulliam filed a motion *in limine* of his own, asking the district court to bar the officers from testifying about the $408 Pulliam possessed. Additionally, Pulliam informed the district court that he planned to elicit testimony from the officers that, during an interview, Pulliam responded to a question by saying "what gun."

The district court prevented the government from presenting an audio recording of the 911 calls but allowed the officers to testify "as to what the dispatcher told them." The district court also allowed the government to elicit testimony about the $408 found on Pulliam. Finally, the district court held that Pulliam could not elicit testimony from the officers about his "what gun" remark.

At trial, Officers Alcazar and Guziec testified about receiving the dispatch call, arriving at the parking lot, and the chase and investigation that ensued. The government also called Alison Rees—a fingerprint specialist for the Bureau of Alcohol, Tobacco, Firearms and Explosives—to testify that no fingerprints were recovered from the gun Officer Alcazar recovered.

Pulliam called his boss and the owner of K&M Auto, Marlon Reid, to testify that Pulliam was normally paid in cash on Fridays. In response, the government called a K&M Auto employee to testify that he personally was paid on Saturdays, not Fridays.

A jury found Pulliam guilty of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1). The district court sentenced Pulliam to 63 months' imprisonment.

After Pulliam's trial and sentencing, the Supreme Court decided *Rehaif v. United States*, 139 S. Ct. 2191 (2019). *Rehaif* held that, for the government to secure a conviction under § 922(g), the government must prove that a defendant knew he belonged to a category of persons prohibited from possessing a firearm. *Id.* at 2200. The jury that found Pulliam guilty was not instructed about this knowledge-of-status element.

## II. ANALYSIS

Pulliam raises four issues on appeal. First, Pulliam argues that the district court's jury instructions constitute a plain error in light of the Supreme Court's decision in *Rehaif*. His other arguments concern three evidentiary rulings that the district court affirmed in its order denying Pulliam a new trial.

*A. Missing Rehaif Instruction*

At Pulliam's trial, the jury was instructed that the government had to prove three elements beyond a reasonable doubt to convict Pulliam of being a felon in possession of a firearm: "[F]irst, that the defendant knowingly possessed a firearm; second, at the time of the charged act [Pulliam] had previously been convicted of a crime punishable by a term of imprisonment of exceeding one year; and third, … the firearm had been shipped or transported in interstate or foreign commerce."

The district court gave this instruction based on well-settled law at the time that § 922(g) "required the government to prove a defendant knowingly possessed a firearm … but not that [the defendant] knew he belonged to one of the prohibited classes." *United States v. Williams*, 946 F.3d 968, 970 (7th Cir. 2020). Seven months after Pulliam's trial, the Supreme Court in *Rehaif* reached a different conclusion, holding that the government must show that "the defendant knew he possessed a firearm and also that he knew he had the relevant status when he possessed it." 139 S. Ct. at 2194.

Pulliam did not argue in the district court that the jury instructions were missing an element. Still, Pulliam believes the jury instructions constitute plain error, requiring a reversal of his conviction. *See* Fed. R. Crim. P. 52(b); *United States v. Maez*, 960 F.3d 949, 956 (7th Cir. 2020) ("We review for plain error even if the objection would have lacked merit at the time of trial, before an intervening change in the law.").

Plain-error review has four elements: (1) an error occurred, (2) that error is plain, and (3) the error affects the defendant's substantial rights. *United States v. Olano*, 507 U.S.

725, 732–34 (1993). These three elements are limitations on ap-
pellate authority, *id.* at 734; if these elements are satisfied, an
appellate court may "then exercise its discretion to notice a
forfeited error, but only if (4) the error 'seriously affect[s] the
fairness, integrity, or public reputation of judicial proceed-
ings.'" *Johnson v. United States*, 520 U.S. 461, 467 (1997) (alter-
ation in original) (some internal quotation marks omitted)
(quoting *Olano*, 507 U.S. at 732).

Pulliam argues that the district court's error affected his
substantial rights and seriously affected the fairness, integ-
rity, or public reputation of judicial proceedings. Importantly,
he argues that—in assessing the third and fourth plain-error
elements—we may only look at evidence actually presented
to the jury. To do otherwise, Pulliam reasons, would contra-
vene his Sixth Amendment right to have "each element of a
crime be proved to the jury beyond a reasonable doubt." *Al-
leyne v. United States*, 570 U.S. 99, 104 (2013).

At the time Pulliam made this argument, we had not yet
addressed how plain-error review applies to pre-*Rehaif*
§ 922(g) convictions by jury verdict. *See, e.g.*, *United States v.
Dowthard*, 948 F.3d 814, 817–18 (7th Cir. 2020) (applying plain-
error review to a pre-*Rehaif* guilty plea); *Williams*, 946 F.3d at
971–72 (same). This question has since been resolved by our
decision in *United States v. Maez*, 960 F.3d 949 (7th Cir. 2020).

In *Maez*, we established the scope of the record we review
when applying the third and fourth elements of the plain-er-
ror test. In assessing the third element (substantial rights), we
look only "to the trial record when a defendant has exercised
his right to a trial." *Id.* at 961 (noting that the Sixth Amend-
ment "mandates this approach"). But in exercising our discre-
tion under the fourth element, we may consider "a narrow

category of highly reliable information outside the trial record[]" that includes "undisputed portions of [a defendant's] PSR[]." *Id.* at 963 (concluding that looking at a prior conviction in a presentence investigation report ("PSR") does not "raise the same Sixth Amendment concerns as other facts").

With the *Maez* framework in mind, we now turn to Pulliam's plain-error arguments. First, we agree with Pulliam and the government that there was an "error" that is "plain" in the jury instructions. The jury was not instructed that the government had to prove Pulliam knew he was a felon when he possessed a firearm. After *Rehaif*, this missing jury instruction amounts to a plain error. *Maez*, 960 F.3d at 964; *see Henderson v. United States*, 568 U.S. 266, 279 (2013) ("[W]e conclude that whether a legal question was settled or unsettled at the time of trial, 'it is enough that an error be "plain" at the time of appellate consideration' for '[t]he second part of the [four-part] *Olano* test [to be] satisfied.'") (alterations in original) (quoting *Johnson*, 520 U.S. at 468).

Turning to the third element, we must determine if the error affected Pulliam's substantial rights. A jury instruction that omits an element of the crime affects a defendant's substantial rights if "it appeared 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v. Caira*, 737 F.3d 455, 464 (7th Cir. 2013) (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)). Put another way, if overwhelming evidence presented to the jury proves the omitted element, we can conclude that the omitted instruction did not impact the verdict and therefore did not affect the defendant's substantial rights. *See, e.g.*, *Maez*, 960 F.3d at 964; *United States v. Groce*, 891 F.3d 260, 269 (7th Cir. 2018).

The substantial rights analysis here is a difficult one. Pulliam stipulated to a prior felony conviction. *See Maez*, 960 F.3d at 964 ("A jury could reasonably think that a felony conviction is a life experience unlikely to be forgotten."). And the jury heard testimony that Pulliam ran from the police, although for a short period of time. *See id.* at 965 (noting that testimony concerning the defendant's attempt to flee from officers relates to the defendant's knowledge of his status as a felon). This evidence is probative of Pulliam's knowledge of his felon status, but it may not be overwhelming evidence "on the new *Rehaif* element of knowledge of status as a felon." *Id.* However, we decline to decide if Pulliam's rights were affected because, even if they were, we would not exercise our discretion to correct this error under the fourth element.

In exercising our discretion under the fourth element, we must ask whether the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (alteration in original) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)). This element "has been compared to a 'miscarriage of justice,' or in other words, 'a substantial risk of convicting an innocent person.'" *Maez*, 960 F.3d at 962 (quoting *United States v. Paladino*, 401 F.3d 471, 481 (7th Cir. 2005)). So, if we are confident that the error in the jury instructions does not create the risk of a miscarriage of justice, we may decline to exercise our discretion to remand for a new trial. *Maez*, 960 F.3d at 965.

Here, undisputed portions of Pulliam's PSR provide strong circumstantial evidence that Pulliam knew he was a felon. Pulliam has been convicted of crimes and sentenced to over a year in prison on several occasions. In 1995, Pulliam pled guilty to possessing a stolen vehicle; he was sentenced to

three years in prison. In 1996, Pulliam pled guilty to possessing a stolen vehicle and was sentenced to four years in prison, which ran concurrently with his prior sentence. Also in 1996, Pulliam pled guilty to escape of a felon from a penal institution; he was sentenced to four years in prison, which ran concurrently with his prior sentences. Pulliam was released on parole in 1998, serving over three years of the concurrent four-year sentence. Then, in 1999, he pled guilty to a narcotics offense and was sentenced to 30 months' probation. His probation was revoked in 2001 and he was sentenced to six years in prison; he served close to two years. *See generally People v. Palmer*, 817 N.E.2d 137, 140 (Ill. App. Ct. 2004) ("On revoking a defendant's probation, the trial court sentences him to a disposition that would have been appropriate for the original offense.").

Pulliam's time in prison—serving over a year at a time on at least two occasions—and the "sheer number of his other convictions" impairs his ability to argue ignorance as to his status as a felon. *Dowthard*, 948 F.3d at 818. We are confident that Pulliam knew he was a felon at the time he possessed a firearm in 2015. So, there is no risk of a miscarriage of justice because the error here does not seriously harm the fairness, integrity, or public reputation of judicial proceedings. *See Maez*, 960 F.3d at 964 ("Affirmance in this instance protects rather than harms 'the fairness, integrity or public reputation of judicia proceedings.'"). We therefore decline to exercise our discretion to correct the error in the jury instructions.

*B. Evidentiary Rulings*

Pulliam next challenges the district court's denial of his motion for a new trial, which relied in part on three underlying evidentiary rulings. Pulliam argues that the district court

erred by (1) excluding the officers' testimony about his "what gun" remark, (2) admitting the officers' testimony that Pulliam possessed $408 when he was arrested, and (3) admitting the officers' testimony about the dispatch call.

We review the district court's denial of a motion for a new trial, as well as its evidentiary rulings, for an abuse of discretion. *United States v. Washington*, 962 F.3d 901, 905 (7th Cir. 2020). We give "special deference" to a district court's evidentiary rulings, *Groce*, 891 F.3d at 268, and we reverse these rulings "only if no reasonable person could take the judge's view of the matter," *United States v. Brown*, 871 F.3d 532, 536 (7th Cir. 2017).

But even the "[i]mproper admission of evidence does not call for reversal if the error was harmless." *United States v. Chaparro*, 956 F.3d 462, 481–82 (7th Cir. 2020); *see* Fed. R. Crim. P. 52(a). "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *United States v. Buncich*, 926 F.3d 361, 368 (7th Cir. 2019) (quoting *United States v. Stewart*, 902 F.3d 664, 683 (7th Cir. 2018)). Essentially, an evidentiary error is harmless if it did not have a substantial influence on the verdict. *United States v. Zuniga*, 767 F.3d 712, 717 (7th Cir. 2014).

We now turn to Pulliam's arguments concerning the district court's order denying him a new trial and the underlying evidentiary rulings.

*1. "What Gun" Statement*

Officers from the Chicago Police Department interviewed Pulliam after his arrest. It is unclear from the record what the

investigating officers asked Pulliam during this interview.[1] But in response to the officers' inquiry, Pulliam's counsel and the district court agreed that Pulliam "denied knowledge [of the gun] and said: 'What gun?'"

Prior to trial, Pulliam informed the district court that he planned to elicit testimony from the officers about the "what gun" remark. The government objected to this testimony as hearsay; Pulliam responded that "what gun" is a question, not a statement, and is therefore not hearsay. Fed. R. Evid. 801(c) ("'Hearsay' means a *statement* that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.") (emphasis added). The district court ruled that Pulliam's remark is inadmissible hearsay, reasoning "that it was an assertion as opposed to a question designed to elicit a response." The district court affirmed this reasoning in its order denying Pulliam's motion for a new trial.

Pulliam argues this ruling was an abuse of discretion. Specifically, he believes that the district court should have resolved the issue in favor of admissibility because of the "highly ambiguous record."

A defendant's out-of-court statement, when offered by the defense, can be hearsay. *See United States v. Sanjar*, 876 F.3d 725, 739 (5th Cir. 2017) ("When offered by the government, a defendant's out-of-court statements are those of a party opponent and thus not hearsay. When offered by the defense,

---

[1] The district court referred to a report describing this interview, but that report is not in the record. Pulliam did not object to the district court's characterization of the report and did not add the report to the record.

however, such statements are hearsay … ."). But not all a defendant's remarks are "statements" for hearsay purposes. Federal Rule of Evidence 801(a) defines a statement as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."

We have held that questions are not statements under Rule 801 and therefore are not hearsay. *See United States v. Thomas*, 453 F.3d 838, 845 (7th Cir. 2006). Since *Thomas* we have elaborated on what makes a remark a question rather than a statement. A defendant's remark is a question if it is "designed to elicit information and a response." *United States v. Love*, 706 F.3d 832, 840 (7th Cir. 2013) (quoting *United States v. Summers*, 414 F.3d 1287, 1300 (10th Cir. 2005)). If the remark is intended to assert information, it is a statement rather than a question. *See Summers*, 414 F.3d at 1300.

Put simply, the intent behind a remark dictates whether it is a statement or a question for hearsay purposes. *See id.* And the context surrounding the remark may help us ascertain the declarant's intent. *See Love*, 706 F.3d at 840; *Summers*, 414 F.3d at 1300. Moreover, the party challenging the admission of the remark has the burden of demonstrating the declarant's intent. Fed. R. Evid. 801 advisory committee's note to 1972 proposed rules. Still, this is a question of fact that "involves no greater difficulty than many other preliminary questions of fact." *Id.*

Here, although the record is ambiguous, it was not unreasonable for the district court to conclude—for purposes of Rule 801—that the government met its burden in showing that Pulliam's "what gun" remark was a statement. This remark was coupled with a statement of denial: "I don't know what you're talking about, and I didn't throw a gun in the

bushes." In this context, it is unlikely that Pulliam was genuinely curious as to which specific gun the officers were questioning him about. *See Summers*, 414 F.3d at 1300. As the district court noted, Pulliam's remark seems more like a rhetorical question "equivalent to saying: I don't know what you're talking about." And since "what gun," in context, reads as a substantive assertion meant to deny knowledge rather than a question meant to elicit a response, the district court did not abuse its discretion in excluding this statement as inadmissible hearsay.

### 2. Money in Pulliam's Possession

Before trial, Pulliam filed a motion *in limine* asking the district court to preclude the government from eliciting testimony concerning the $408 recovered from Pulliam. Pulliam argued that the testimony "would be significantly more prejudicial than probative." Fed. R. Evid. 403. The government responded that evidence of the amount of money Pulliam carried would be relevant for the purpose of proving that Pulliam had a motive to possess a gun because of his "involvement in the inherently dangerous business of street level drug sales." That logic looks something like this: testimony about the cash was offered for the purpose of showing Pulliam was dealing drugs at the time of his arrest, which would give him a reason to have a gun.

The district court ruled that testimony about Pulliam's cash is admissible to show his motive for carrying the gun. *See* Fed. R. Evid. 404(b) (evidence of crimes, wrongs, or other acts is not admissible to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but it can be admitted for purposes

such as motive). The district court affirmed this reasoning in its order denying Pulliam's motion for a new trial:

> Pulliam argues that this [evidence] was unfairly prejudicial. However, his own closing arguments that he had no incentive to possess a gun demonstrate the significant probative value of this evidence for it provides a motive for possessing the gun in the first instance. The Court finds that any unfair prejudice did not substantially outweigh that probative value.

"Federal Rule of Evidence 404(b) prohibits the use of evidence of a defendant's other bad acts to show his propensity to commit a crime." *United States v. Norweathers*, 895 F.3d 485, 490 (7th Cir. 2018). In this case, the "other bad act" evidence was the officers' testimony about Pulliam's cash, which was admitted to show that Pulliam was dealing drugs. But this other-act evidence may be used for a non-propensity purpose "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

The problem with other-act evidence is that it may often be used for a permitted use—like showing motive—and an impermissible use—like showing a propensity to commit a crime. *United States v. Morgan*, 929 F.3d 411, 427 (7th Cir. 2019). Still, even if the evidence might support a propensity inference, it may be admitted so long as its admission for a permissible purpose is "supported by some propensity-free chain of reasoning." *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc) ("Rule 404(b) excludes the evidence if its relevance to 'another purpose' is established *only* through the forbidden propensity inference."). Stated another way, the district court should "not just ask *whether* the proposed other-act

evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose." *Id.*

But even if evidence is "relevant without relying on a propensity inference," it may still be excluded under Rule 403. *Id.* A court may exclude relevant evidence if its "probative value is substantially outweighed by a danger of … unfair prejudice." Fed. R. Evid. 403. Other-act evidence presents a unique Rule 403 problem: "it almost always carries some risk that the jury will draw the forbidden propensity inference." *Gomez*, 763 F.3d at 857. Because of that risk, Rule 403 balancing in this context is difficult and is a "highly context-specific inquiry." *Id.* Still, one guiding principle has emerged: we must take into account "the degree to which the non-propensity issue actually is disputed in the case." *Id.*; *see United States v. Brewer*, 915 F.3d 408, 415–16 (7th Cir. 2019).

Pulliam does not seem to contest the district court's 404(b) analysis. He points out that "[p]roving motive can be a permissible purpose for the introduction of 'other acts,' such as alleged drug activity." Indeed, we have approved of admitting "other-act" evidence of drug dealing to prove the defendant had a motive to possess a firearm. *See United States v. Schmitt*, 770 F.3d 524, 533–35 (7th Cir. 2014) (admitting testimony that drugs were found in Schmitt's home for the purpose of proving a motive to possess a gun when possession was disputed at trial). Pulliam instead argues that the district court's Rule 403 analysis in its order denying Pulliam's new trial was an abuse of discretion. He also argues that the district court failed to consider all of the unfairly prejudicial effects of this evidence.

Testimony about Pulliam's cash presents the prototypical "other-act" evidence problem. The jury heard testimony

about the cash, which was admitted for the purpose of show-
ing that Pulliam was dealing drugs at the time of his arrest,
which would give him a motive to possess a gun. But the jury
just as easily could have drawn the inference that Pulliam
"was the type of person who would break the law once" by
dealing drugs, so "he must be the type of person who would
break the law again" by possessing a firearm as a felon. *Id.* at
534. So, the jury could have used this evidence for an im-
proper propensity purpose, creating a risk of unfair prejudice.

But this evidence was also probative of a central issue at
trial. Motive to possess a gun—the non-propensity issue—
was hotly disputed. *Cf. Gomez*, 763 F.3d at 857. And the testi-
mony concerning Pulliam's cash was offered in support of
that motive. Pulliam disputed that he possessed a gun and
that he had a motive to possess a gun. In his opening state-
ment, Pulliam made his theory of the case clear: "He was ar-
rested frankly for being in the right place, a place he had every
right to be, at the wrong time." Pulliam also cross-examined
the officers about whether they had seen Pulliam engage in
drug transactions, if they found drugs on him, and if they
knew how he got the $408. Additionally, Pulliam's boss at
K&M Auto testified that Pulliam is paid in cash on Fridays,
giving him an innocent reason to possess the cash. Pulliam
tied this all together in his closing argument: "There were no
drugs on him. He had $400 that he got paid that day. What
would be the incentive to have a gun? There was no incentive
to have a gun." Pulliam thus made possession, and a motive
to possess a gun, "central to the case." *Brewer*, 915 F.3d at 416.
Evidence about his motive, then, was highly probative. *See
Gomez*, 763 F.3d at 857.

But the specific motive evidence—testimony about cash found on Pulliam's person—is not strong evidence of drug-dealing activity, and therefore, even more tenuous evidence of motive. The officers did not find any drugs on Pulliam's person or in the parking lot. Instead, the government presented the cash found on Pulliam and his brief period of flight as circumstantial evidence of drug dealing. This evidence is substantially weaker, and so less probative, than the evidence of drug dealing and motive in *Schmitt*, which included drugs found at the defendant's home. 770 F.3d at 534.

Still, Pulliam's possession of a gun and his motive for possession were squarely at issue during trial and were heavily contested. So it was not unreasonable, and therefore not an abuse of discretion, for the district court to conclude that the testimony's probative value was not substantially outweighed by the potential unfair prejudice of the jury assuming that Pulliam was a drug dealer, and thus more likely to commit other crimes. *See Brewer*, 915 F.3d at 416 ("The evidence of the Ohio and California robberies was of course prejudicial—all other-act evidence is—but given that Brewer put his identity and intent squarely at issue, it was not unfairly so."); *cf. United States v. Foley*, 740 F.3d 1079, 1088 (7th Cir. 2014) ("Our role on appeal … is not to apply the Rule 403 balancing test *de novo* but to review the district court's decision for an abuse of discretion.").

Finally, Pulliam takes issue with the district court's reasoning affirming this evidentiary ruling in its order denying Pulliam a new trial. He argues that the district court failed to consider "the unfairly prejudicial effect of using the innocent act of carrying cash to support the conclusion of criminal drug trafficking." The district court acknowledged Pulliam's unfair

prejudice argument, but ultimately concluded "that any un-
fair prejudice did not substantially outweigh" the probative
value of the testimony.

A district court's provided reasoning amounts to an abuse
of discretion when the court fails to explain its "bare-bones
conclusion that 'the probative value of the evidence is not sub-
stantially outweighed by the danger of unfair prejudice.'"
*United States v. Ciesiolka*, 614 F.3d 347, 357 (7th Cir. 2010); *see*
*United States v. Eads*, 729 F.3d 769, 777 (7th Cir. 2013) (finding
the district court's Rule 403 analysis insufficient where it did
not explain the specific probative value or risk of prejudice
presented by the evidence). This is because "[a] pro-forma
recitation of the Rule 403 balancing test does not allow an ap-
pellate court to conduct a proper review of the district court's
analysis." *United States v. Loughry*, 660 F.3d 965, 972 (7th Cir.
2011) (finding that the district court's Rule 403 reasoning
amounted to an abuse of discretion when it only explained
that "the Court conducted the Rule 403 balancing test and
concluded that the probative value of the Government's evi-
dence was not substantially outweighed by the danger of un-
fair recitation").

It is true that the district court could have provided more
thorough reasoning concerning its Rule 403 decision. But the
district court emphasized the probative value of the testimony
concerning Pulliam's cash: "[Pulliam's] own closing argu-
ments that he had no incentive to possess a gun demonstrate
the significant probative value of this evidence for it provides
a motive for possessing the gun in the first instance." Consid-
ering this probative value, the district court reasoned that
"any unfair prejudice did not substantially outweigh that pro-
bative value." *See United States v. Adkins*, 743 F.3d 176, 184 (7th

Cir. 2014) ("[T]he district court found the … evidence more probative than prejudicial for the same reasons that it found the evidence to be direct evidence of criminality: the evidence went to [the defendant's] knowledge, preparation, and intent."). Essentially, in conducting the Rule 403 analysis, the district court determined that the evidence had significant probative value, and that the unfair prejudice Pulliam argued he suffered as a result of this testimony would not substantially outweigh that probative value.

This analysis is not "bare-boned" and provides enough reasoning for us to properly review it, especially since the only unfair prejudice Pulliam argues is that he was unfairly depicted as a drug dealer. So, although the district court could have provided more extensive reasoning to support its Rule 403 conclusion, the analysis provided does not amount to an abuse of discretion.

### 3. *Dispatch Call*

The district court, over Pulliam's objection, allowed the government to elicit testimony from the officers concerning the dispatch call they received. The district court reasoned:

> The government argues that the [anonymous 911 calls] provide the jury with the *context* for why the police officers were in the McDonald's parking lot and why they approached Mr. Pulliam. There's no suggestion that the officers listened to the 911 calls before arriving at the McDonald's parking lot and seeing Mr. Pulliam there. The officers were responding to a report from their dispatcher. Therefore, *for these purposes* it would be appropriate for the officers to testify as to what the dispatcher told them, which

> may include that the emergency response center had
> received two calls of suspected drug sales.

(emphasis added). And in its order denying Pulliam a new trial, the district court declined to alter this decision: "The court finds again that the dispatch information was relevant to the officers' state of mind to explain their actions when they attempted to approach the group of men including Pulliam."

Pulliam argues that testimony concerning the dispatch call was highly prejudicial, had little probative value, and the district court abused its discretion by not excluding this evidence under Rule 403. The government argues that—like the testimony concerning Pulliam's cash—the testimony about the dispatch call was admitted to show that Pulliam had a motive to possess a firearm because he was dealing drugs. And since motive and possession were disputed, the probative value of testimony about the dispatch calls outweighs its potential for unfair prejudice.

We disagree with the government's characterization of the district court's reason for admitting this testimony. The district court, in both its rulings on the testimony about the dispatch call, does not explicitly tie this evidence to motive. Instead, in admitting this evidence and affirming this decision, the district court emphasized the testimony's relevance to provide *context* for why the officers approached Pulliam. So, the district court did not allow the officers to testify about the dispatch call to prove that Pulliam had a motive to possess a gun because he was dealing drugs; it instead admitted this evidence to provide context for why the officers approached Pulliam prior to his arrest.

And considering the purpose for which the evidence was actually admitted, the dispatch call had minimal probative

value. The reason why the officers showed up at the parking lot was not disputed at trial. Importantly, it also had "nothing to do with the charge[] in this case," possessing a gun. *United States v. Cooper*, 591 F.3d 582, 589 (7th Cir. 2010). It is hard to see how this evidence could have any probative value when it had no relation to the offense charged or the disputed issues. *See United States v. Nelson*, 958 F.3d 667, 670 (7th Cir. 2020) (expressing concerns "about overuse of the 'complete-the-story' theory of relevance").

This testimony also had a potential for unfair prejudice. The dispatch call informed the officers of a potential narcotics sale in the parking lot where they found Pulliam. The jury could have drawn the same inference from this evidence as it could have from testimony about the cash on Pulliam's person: Pulliam "was the type of person who would break the law once" by dealing drugs, so "he must be the type of person who would break the law again." *Schmitt*, 770 F.3d at 534. But unlike the testimony about the cash found on Pulliam, the testimony about the dispatch call has almost no probative value; this makes it hard to accept almost any risk of prejudice, *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012). So, the question of whether the district court abused its discretion in its rulings related to this evidence is a close call.

But we need not answer this question because, even if this evidence was improperly admitted, its admission was harmless.[2] *See United States v. Miller*, 954 F.3d 551, 560–64 (2d Cir.

---

[2] Pulliam asks us to apply a cumulative error analysis because he argues the district court committed multiple errors. To demonstrate cumulative error, Pulliam must show that at least two errors occurred and that he was denied a fundamentally fair trial. *Groce*, 891 F.3d at 270. True, if we find an evidentiary error occurred in addition to the error in the jury

2020) (analyzing an evidentiary error for harmlessness when there was also a *Rehaif* error in the jury instructions that did not "rise to the level of reversible plain error").

Both officers testified in detail about the events leading to Pulliam's arrest. The officers testified that as they approached the group of men in the parking lot, Pulliam began to walk away and disappeared behind a van. When he emerged from behind the van, both officers saw a chrome gun in Pulliam's hand. Officer Guziec yelled "gun" and drew his own weapon; Pulliam ran from the officers and into a nearby alley. Officer Alcazar testified that, at this point, he was a few feet away from Pulliam and did not lose sight of him during the entire chase. Pulliam then raised his hands, turned around, and threw the gun toward the McDonald's dumpster. Officer Alcazar testified that he saw Pulliam throw the gun and saw approximately where the gun landed. Officer Guziec also testified that he saw Pulliam throw the gun.

Officer Guziec then escorted Pulliam back to the squad car. Officer Alcazar testified that he split from Officer Guziec and went to retrieve the gun Pulliam had just thrown. When Officer Alcazar got to the area where the gun landed—near the McDonald's dumpster—he saw only one, chrome gun. Officer Alcazar testified that he retrieved this gun within one minute of Officer Guziec detaining Pulliam.

---

instructions, there would be at least two errors. But even if we were to consider the cumulative effect of these errors, it would not change the outcome here. We have already decided that the jury-instruction error did not affect the fairness of Pulliam's trial proceedings. And one harmless evidentiary error would not then make Pulliam's trial fundamentally unfair.

The officers provided extensive testimony proving that Pulliam knowingly possessed a firearm, the only issue disputed at trial. We are therefore convinced that excluding the officers' brief testimony concerning the dispatch call would not have made the government's case significantly less persuasive. *See Buncich*, 926 F.3d at 368–69. Any error in admitting this evidence, then, would be harmless.

### III. CONCLUSION

Because the error in the jury instruction does not seriously affect the fairness, integrity, or public reputation of judicial proceedings, and because the only potential evidentiary error would be harmless, we AFFIRM Pulliam's conviction.