In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 22-3306

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DARYL G. MCGHEE,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:21-cr-10008-JBM-JEH-1 — **Joe Billy McDade**, *Judge.*

_____

ARGUED NOVEMBER 06, 2023 — DECIDED DECEMBER 21, 2023

_____

Before FLAUM, SCUDDER, and KIRSCH, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Early the morning of February 13, 2021, the police in Peoria, Illinois received a 911 call reporting domestic violence. The caller told responding officers that Daryl McGhee, her husband and alleged abuser, had fled the house toward a nearby apartment complex carrying a gun and leather bag. Footprints in the snow led the police to McGhee, who was hiding near an apartment building. Moments later a K-9 unit found a leather bag under a nearby

dumpster. Federal charges followed for the handgun and co-
caine found in the bag, and McGhee chose to go to trial. The
district court precluded McGhee from testifying in any way
about the domestic violence—even prohibiting him from
denying the allegation—and threatened to jail him and his de-
fense counsel for six months if they violated the court's ad-
monishment. While what transpired is most unsettling, we
cannot say the district court's overbroad ruling and directive
affected the outcome of McGhee's trial. So, albeit with some
unease, we affirm.

# I

## A

Everything began when Sherrce McGhee called the police
to report that her husband had assaulted her. Despite the dif-
ficult weather—it was snowing and less than ten degrees—
officers arrived at the McGhee home within minutes. Sherrce
reported that her husband had "already left running, out the
back door," with an "MCM bag on him, with a gun on him."
Sherrce suggested that her husband was "probably back like
two apartments over waiting on somebody" to pick him up,
"or he's over at the apartments, if you go past the post office
to your left over there, waiting on a ride."

Officer Justin Kirby set out to find McGhee. Behind the
house, he noticed fresh footprints leading out a back gate. The
footprints led Officer Kirby across a parking lot, through a
corridor between two apartment buildings, across a street and
into a second parking area, where he briefly lost the foot
tracks. Seeing a fresh set of tire tracks in the parking area, he
radioed that McGhee might have gotten into a car and driven
away. But after continuing to walk in the same direction,

Officer Kirby picked up the footprints again and followed them along the length of an apartment building. Peering around the corner of the building, he saw McGhee hiding in bushes and wearing only a light coat despite the freezing weather.

After placing McGhee in handcuffs, Officer Kirby and his partner discovered a bundle of cash ($381) behind a nearby bush. A K-9 team arrived and soon detected and recovered a tan leather MCM bag underneath a dumpster along McGhee's flightpath. The bag contained 140 grams of cocaine and a loaded DVC Tactical 1911 handgun.

A grand jury indicted McGhee on three counts: possession with intent to distribute cocaine (21 U.S.C. § 841(a)(1), (b)(1)(C)), possession of a firearm as a felon (18 U.S.C. § 922(g)), and possession of a firearm in furtherance of a drug trafficking crime (18 U.S.C. § 924(c)). During pretrial proceedings, the district court rejected McGhee's motion to exclude two Facebook photos and a Snapchat video depicting him with a gun and bag identical to the items recovered by police. Alongside that ruling, the court granted a motion from the government to admit Sherrce's statements to the police upon their arrival at her house in response to her 911 call as an excited utterance. The jury ultimately found McGhee guilty of the felon-in-possession charge but deadlocked on the other two counts.

McGhee proceeded to a second trial on the § 841(a)(1) and § 924(c) charges. During its case in chief, the government presented the Facebook and Snapchat posts of McGhee holding an MCM bag and gun. The jury also heard from the two officers who had spoken with Sherrce at her doorstep and viewed a map of Officer Kirby's search route, body camera footage,

and pictures of the items recovered at the scene. The officers testified that Sherrce told them McGhee had hit her in the jaw and then left the house running with a gun toward a nearby apartment building. A drug trafficking expert testified and explained that the brick-like form and large quantity of cocaine found in the MCM bag were consistent with mid-level drug dealing and that drug dealers commonly use and conceal semiautomatic handguns like the one officers recovered.

B

Our primary focus is on what transpired after the government wound down its case and McGhee informed the district court that he wished to testify in his own defense. It was then that the district court—on its own initiative and without any request from the government—admonished McGhee that he was prohibited from presenting evidence or testifying about "events prior to the 911 emergency call," including the domestic violence allegation. Sherrce's statement to police that McGhee had hit her, the district court underscored, did not relate to the merits of the drug distribution and associated firearm offenses on trial.

The district court's impromptu order caught everyone by surprise and led to a tense exchange between the district judge and McGhee's counsel, Anthony Burch. Burch argued that the defense should be permitted to respond to the domestic violence testimony the court permitted the jury to hear during the government's case in chief. But the district court rejected defense counsel's concerns, reasoning in the vein of Federal Rule of Evidence 403 that any discussion of events before the 911 call by the defense would confuse the issues. The district court also rejected McGhee's request to testify about the nature of his relationship with his wife, reiterating that the

trial pertained only to the drug distribution and related § 924(c) charges.

The court then went further. The district judge directed the U.S. Marshals to take McGhee and defense counsel into custody if they violated the exclusionary order. This directive caught defense counsel even more off guard. He immediately voiced concern that the threat of incarceration imposed a "chilling effect" on his ability to defend McGhee. Defense counsel emphasized that he had no intention of violating the court's order—underscoring that he had done nothing throughout the trial to warrant such a harsh and strident threat. The district judge agreed but did not budge, stating that the court "want[ed] to ensure that you don't do it in the future." Defense counsel pushed back, insisting that he needed some room to respond to the government's evidence and to defend McGhee without worry of "whether or not I'm going to jail." But the district judge would have none of it:

> No, I will not accept that, Mr. Burch. You have to decide whether or not you're going to violate my order because only if you violate my order will you go to jail …. [L]et's be truthful and straightforward. That's what you have to worry about. *Do I violate this judge's order on behalf of my client?* That's what you have to decide. If you decide, *No, I'm not going to violate his order*, then you have nothing to worry about. That's how I see it.

Defense counsel later asked the district judge to revisit its exclusionary order, explaining that McGhee's "whole defense" was that Sherrce planted the bag under the dumpster. To that end, defense counsel wanted to elicit testimony that

McGhee had not left the house carrying the MCM bag, that someone in a car may have placed the bag under the dumpster, and that McGhee suspected that person to be Sherrce. After some back and forth, the district judge approved these requests, clarifying that such testimony related to post-911-call events and did not fall within the scope of the exclusionary order. But the district court reiterated in no uncertain terms that McGhee was not to address the domestic violence allegation.

These limitations left the government uneasy. Indeed, the Assistant United States Attorney affirmatively told the district judge that, in the government's view, McGhee should not be categorically barred from testifying about events that occurred before the 911 call as part of putting on a defense. But the district judge would not budge, insisting that the prior ruling stand.

During his direct examination, McGhee testified that he had not left the house with the MCM bag, had not taken a gun with him, and would not have done so because Sherrce told him before he left the house that he was "going to jail." On cross-examination, McGhee made some material admissions. He admitted that the firearm depicted in the Snapchat video matched the gun the police found in the MCM bag and, furthermore, that he possessed 20–30 bags identical to the one that police recovered under the dumpster. McGhee also acknowledged leaving the house with $381 in cash and waiting near the apartment building for someone to pick him up before the police caught and arrested him. The jury deliberated for 20 minutes before finding McGhee guilty on both counts.

The district court then denied McGhee's motions for a judgment of acquittal and a new trial, explaining first that "[t]he amount of time between when Defendant passed the dumpster and when officers arrived in the vicinity of the dumpster was mere minutes. Given Defendant's admitted connections with the bag and gun, any explanation of how the bag, gun, and cocaine got there, besides via [McGhee] putting them there, is utterly fantastic."

The district court further rejected McGhee's arguments that the exclusionary order and the criminal-contempt warning infringed on his constitutional right to present a defense. See *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (explaining that the Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation Clauses of the Sixth Amendment guarantee "a meaningful opportunity to present a complete defense" (internal quotation marks omitted)). As the district court saw it, the excluded testimony was "irrelevant" and its absence in no way accounted for the jury's guilty verdict. In time sentencing followed, with McGhee receiving a sentence of 152 months' imprisonment.

McGhee now appeals, challenging the exclusionary order and the stern sanctions threat that accompanied it.

## II

### A

McGhee contends that the district court wrongly excluded evidence of relevant events leading to the 911 call—in particular, whether he engaged in any domestic violence on the night in question.

While relevant evidence is generally admissible, a district court may exclude evidence whose probative value "is

substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. A district court has "wide discretion" to rule on the admissibility of evidence. *United States v. Taylor*, 701 F.3d 1166, 1172 (7th Cir. 2012). But even if we conclude that the district court's evidentiary ruling was erroneous, we will reverse only if the error was not harmless. See *United States v. Boros*, 668 F.3d 901, 910 (7th Cir. 2012). Resolving that question requires asking whether, absent the evidentiary error, the prosecution's case would have been significantly less persuasive. See *United States v. Thornton*, 642 F.3d 599, 605 (7th Cir. 2011); see also *United States v. Pulliam*, 973 F.3d 775, 782 (7th Cir. 2020).

B

We have no trouble agreeing that the district judge's decision to limit McGhee's testimony was on solid ground. Allowing McGee to delve into his wife's allegation of abuse by offering his account of what led to the 911 call risked transforming a narcotics and firearm trial into a domestic-dispute trial. The district court understandably sought to keep the trial focused on the charged offenses. See *United States v. Alayeto*, 628 F.3d 917, 922 (7th Cir. 2010) (explaining that Rule 403 permits a court to exclude evidence that distracts from "the central issue in the case," especially when that evidence has "minimal relevance").

Yet the exclusionary order strikes us as overbroad in a material way. Recall that the government elicited testimony from the Peoria police about Sherrce's 911 call and the allegations of abuse committed by McGhee. By any measure, this testimony cast McGhee in an awful light, portraying him as a

violent spouse who physically harmed his wife, only then to
flee the house with a gun before the police arrived. McGhee's
defense was to turn the table on Sherrce by suggesting to the
jury that she fabricated the abuse allegation, which would
have contributed to his theory that she choreographed the en-
tire sequence of events, from forcing him to leave the house,
to tricking the police into searching for him, to the discovery
of the MCM bag under the dumpster.

No doubt the district court's exclusionary order sought to
minimize confusion of the issues, but its broad scope unnec-
essarily limited evidence relevant to McGhee's primary de-
fense. The district court could easily have policed the limita-
tions of a narrower order—one that permitted McGhee to
deny full stop Sherrce's allegation that he had hit her but then
to go no further. Instead, the district court altogether silenced
McGhee, requiring him to avoid the subject entirely, leaving
the jury positioned to find or assume that McGhee did hit his
wife. When McGhee took the stand, after all, he said nothing
to deny the domestic violence allegation. An order that nar-
rowly prohibited McGhee from lingering on the topic of do-
mestic violence and from delving into his marital issues
would have lowered the risk of a domestic violence minitrial
without causing a risk of unfair prejudice.

But we cannot say that the overbroad order violated
McGhee's constitutional right to present a "complete de-
fense." *Holmes*, 547 U.S. at 324. Defense counsel could have
argued that Sherrce framed her husband based on the evi-
dence otherwise admitted. Her 911 call and subsequent state-
ments to the police at her home left no doubt that she wanted
McGhee arrested. Multiple parties testified to the tire tracks
in the parking lot, and the jury knew that the recovered

evidence lacked fingerprints. Defense counsel could have leveraged this evidence to suggest that Sherrce, sometime before or even after calling the police, drove to the parking lot and tossed the MCM bag under the dumpster.

Do not overread our observation. In no way are we suggesting that a framing defense had any merit. Our observation is limited only to saying that the district court could (and should) have allowed McGhee to deny the alleged domestic abuse. The district judge could have done so without the trial losing its focus and devolving into a distracting "she said, he said" marital dispute.

In the final analysis, though, we conclude that a reasonable juror would not find the government's case "significantly less persuasive" absent the overbreadth of the order. *Thornton*, 642 F.3d at 605. Put another way, we cannot conclude that the district court's evidentiary order had a "substantial influence over the jury" and resulted in a verdict "inconsistent with substantial justice." *United States v. Seals*, 419 F.3d 600, 607 (7th Cir. 2005) (internal quotation marks omitted).

On these fronts, the district court was right to describe the suggestion that Sherrce placed the MCM bag under the dumpster as "utterly fantastic." It is implausible, for instance, that she predicted McGhee's exact route from her home to the dumpster. Indeed, she made only a vague statement to police as to her husband's likely location. And the officers followed McGhee's footprints through the snow—not Sherrce's vague directions. Police might have missed the dumpster entirely had they not tracked McGhee's footprints carefully—or if McGhee's friend had picked him up before the officers could find him.

It is also implausible that Sherrce collected the loaded gun, a brick of cocaine, and one of the MCM bags, then placed those items under a dumpster two blocks away from the house before calling the police, all without arousing her husband's suspicion. The defense's alternative suggestion that she placed the bag under the dumpster *after* calling 911 also strains credulity. The amount of time between when McGhee would have passed the dumpster and his arrest was mere minutes, leaving Sherrce with too short a window to plant the bag.

The tire tracks in the parking lot—viewed in conjunction with Sherrce's statement to the police that her husband left the house "out the back" with an MCM bag and a gun—support only very remotely the inference that Sherrce placed the bag under the dumpster. The excluded testimony would not have rendered this inference any less remote and so would not have undermined the strength of the government's case. In the end, then, we will not disturb McGhee's convictions despite the overbreadth of the exclusionary order. The evidence of McGhee's guilt was overwhelming.

But we cannot stop there.

### III

What jumps out about this appeal is also what troubles us the most. Not only can we not discern what prompted the district judge's impromptu exclusionary order, we are at a greater loss to understand what warranted such a tense and terse exchange with McGhee's counsel. We have read it many times and cringed each time, as the remainder of the trial transcript suggests that McGhee's counsel, Anthony Burch, conducted himself honorably and professionally throughout the

trial, working hard to defend a client in a case where the government had assembled overwhelming evidence of guilt.

Even if the district court's broad exclusionary ruling was correct—a proposition we very much doubt—nothing we can see warranted putting defense counsel on the verge of criminal contempt and being hauled to jail. Indeed, if the district court had to do it all over again, we are confident a more measured and effective path would have been charted. Words and tone matter, and sometimes restraint best respects rights.

With these closing reservations, we AFFIRM.